(Nos. 2888-2891, Feb. 21, 1924.)

## STATE v. MAGEE PUB. CO. et al.

### SYLLABUS BY THE COURT.

1. The power of courts to punish for contempts is inherent. Its existence is essential to the preservation of order in judicial proceedings and to the enforcement of obedience to their writs, orders, and mandates, and consequently to the due administration of justice.

2. Contempts are divided into two classes, civil and criminal. "Civil contempt" includes those proceedings in the nature of contempt, instituted to preserve and enforce the rights of private parties to suits, and to compel obedience to the orders, writs, mandates, and decrees which are made to enforce the rights as well as to administer the remedies to which such parties are entitled. Such punishment is remedial in character, to compel obedience to the order, writ, mandate, or decree which has been violated, while "criminal contempt" embraces all acts committed against the majesty of the law, or it may be said to include those acts done in disrespect of the court, or which obstruct the due and proper administration of justice, or which tend to bring the court into disrepute in the form of public opinion.

3. Writing, printing, publishing, and circulating articles regarding a pending case, in which the acts and conduct of the judge are discussed and criticized, constitute "criminal" rather than civil contempt.

4. At common law, the power to pardon was vested in the king; it was one of the rights, attributes, and preroga-

tives of the crown. In the federal government of the United States, it is vested in the President, while most, if not all, of the states have vested the same in the Governor.

5. In this state, much power is vested in the Governor by section 6 of article 5 of the Constitution.

6. Under such consitutional grant of power the Governor can pardon, after conviction, for criminal contempt.

Ryan, District Judge, dissenting.

Appeal from District Court, San Miguel County; Leahy, Judge.

The Magee Publishing Company and another were convicted of contempt of court, and they appeal. On motion of the Attorney General to dismiss after pardon of defendants by Governor. Motion sustained.

R. H. Hanna and Fred E. Wilson, both of Albuquerque, for appellants.

A brief reference to Blackstone will disclose that the pardoning power, as stated in our Constitution, is declaratory of the power of the crown at common law. If this be true, and the power to pardon for contempts exists at common law, the technical refinements of plaintiff's brief are of little moment. We submit that the exercise of the power of the Governor is in the nature of a review of judicial proceedings and simply an instance of the disposition of the framers of every American Constitution, from the first to the present time, to establish checks and balance in administrative and governmental affairs. If it be unwise to trust the Governor with the right to review, because of the possible abuse of his authority, is it not equally pertinent to suggest that judicial officers might sometimes be found who might be guilty of abuse of the power reposed in them, if there was no right to review?

See State, ex rel Rodd, v. Verage, 23 A. L. R. 491, following which report is to be found an interesting case note.

The power of the Governor to pardon in criminal contempts does not go to the processes of the court,

with which it has nothing to do, but reviews the results and is inspired with the desire to commingle the element of mercy with the strict rules of law applied by the court. The Governor is vested with the veto power as to acts of the legislature. Is that any more of an invasion of the legislative functions than the exercise of the pardoning power, even in cases of criminal contempt? The existence of either is in no wise an invasion of the functions of the other branch of the government.

Since when has the bar and bench of New Mexico, or any other state, assumed to say that under the American form of government the exercise of power can only be safely reposed in judicial officers, without the right to review the acts of such officers, and cannot be safely reposed in the Governor of the State, elected by the people of the State, who cannot be trusted with authority to grant a pardon in the case of contempts of court, but who can be trusted to grant a pardon on behalf of any murderer or persons charged with any other criminal offense? Are we to assume that the framers of our Constitution could not have intended to grant the right of pardon in contempts of court, criminal in their nature, constituting offenses against the State because it would be an invasion of the functions of the judiciary, in the face of the declarations of these framers of the Constitution that the Governor "shall have power to grant reprieves and pardons, after conviction, for *all offenses,* except treason and in cases of impeachment." When our courts are prepared to declare that our judges alone are to be trusted with arbitrary power, without the right to review, and that our Governors cannot be trusted with the power to pardon, the courts will confess and declare that our form of government is a failure and that our executives are not to be trusted because forsooth the exercise of the pardoning power would require the "courts to bend their knees to the caprices of the Governor." The writer of this brief is astonished at the advancement of any such theories or doctrines and suggests that the declaration by this court or any other court of such

principles would most effectively destroy the confidence of the people in the courts and would amount to a declaration of alleged superiority in the courts over other branches of the government, a suspicion of which is already bringing the courts of some of our states into disrepute.

Let us analyze the difference between civil and criminal contempts. In 13 C. J., p. 6, criminal contempt is defined as follows:

"Criminal contempt is conduct that is directed against the dignity and authority of the court and may occur in either criminal or civil actions and special proceedings."

The same authority defines civil contempt as follows:

"Civil contempt constitutes the failing to do something ordered to be done by the court in a civil action for the benefit of the opposing party therein and is therefore not an offense against the dignity of the court but against the party in whose behalf the violated order is made."

The same authority, at page seven, points out that criminal contempts "being offenses directed against the dignity and authority of the court, are offenses against organized society, which, although they may arise in the course of private litigation, are not a part thereof, but raise an issue between the public and the accused and are, therefore, criminal and punitive in their nature."

This statement of the principles applicable is supported by numerous authorities collected in case note No. 24, following the text quoted. The only jurisdiction to be found in the United States, holding that criminal contempt of court is not a criminal offense is Texas. The courts of that state have evidently followed the rather unusual language of the Constitution of that state, as has already been pointed out in this brief.

The reasons for the vesting of the pardoning power in a Governor are well set out and deserving of careful attention in an editorial note following the case of

State v. McIntyre, reported in 59 American Decisions 556, at 572. See also: 20 R. C. L., page 537 and 6 R. C. L., page 540.

Repalje on Contempts, Section 162, under the subject of "Executive Pardon," states the rule as follows:

"A contempt of court is an offense against the State, and not an offense against the judge, personally; therefore an order of the judge inflicting punishment for such contempt comes within the range of the pardon prerogative vested by the Constitution in the executive." This rule was announced by the author in 1887. See: Ex Parte Mullee, 7 Blatchf. U. S. 24; State, ex rel Van Orden, v. Sauvinette, 24 La. Ann. 119, 13 Am. Rep. 115; Merchant Stock and Grain Company et al v. Board of Trade, City of Chicago et al, 201 Fed. 20.

Our view of the distinguishing characteristic between civil and criminal contempt, which we have referred to in this brief, finds support in the case of Gompers v. Buck Stove and Range Company, 221 U. S. 442.

Counsel for the State has labored diligently and rather strenuously to impress upon the court the fact, as he sees it, that the term "offense" must be construed in light of the provisions of Section 14, Article II, of our Constitution, dealing with capital, felonious, and infamous crimes, and that therefore, criminal contempt, not being a capital, felonious or infamous crime, because it is a summary proceeding, the power to pardon as conferred by the Constitution upon the Governor has no application.

See definition of "offense" by Bouvier and by The New Standard Dictionary.

We have already referred to the fact that in our opinion the constitutional grant of power to the Governor is in fact a declaration of the common law rule on the subject. The first quotation from Blackstone points out the difference referred to in this brief as to

the pardoning power in civil and criminal contempts. See: Book IV, Blackstone, 284, 316, 399.

A number of federal authorities, following the rule laid down in the Gompers case as to the test of character of contempt by an examination into the character of punishment, might be cited. They are collected in Shepard's Federal Citations, under the reference to the Nevitt case. See, also, In re Mason, 43 Fed. 510 at 515. See also: In re Kerrigan, 33 N. J. Law 344; Rhinehart v. Lance, 43 N. J. Law 311.

The Territorial Supreme Court in the Costilla Land and Investment Company v. Allen, 15 N. M. 528, in an opinion by Judge Pope, distinguished between criminal and civil contempts closely following the principles announced in the federal case which we have referred to. (See also Marinan v. Baker, 12 N. M. 451.)

Luis E. Armijo, of Las Vegas, O. O. Askren, of East Las Vegas, & C. J. Roberts, of Santa Fe, M. J. Helmick, of Albuquerque, and John W. Armstrong, of Santa Fe, for the State.

The information is not required to be filed in the name of the State. U. S. v. Territory of Arizona, 6 L. R. A. (N. S.) 572.

It must not be forgotten that this is not a criminal prosecution in the ordinary sense. It is not a prosecution for the violation of the penal statutes of the State. It is a proceeding for the vindication of the power and authority of the court and to enable the court to preserve its dignity and to protect the rights of litigants. The court having knowledge of the contempt might proceed of its own motion without even the filing of information. Telegraph Newspaper Company v. Commonwealth, 44 L. R. A. 159; Commonwealth v. New York C. & H. R. R. Co., 206 Mass. 422, 19 Am. Cas. 529; 6 R. C. L. 531.

In the case of ex parte Duncan, Texas, 182 S. W. 313, 2 A. L. R. 222, the court held that the contempt

committed outside of the presence of the court was brought to the attention of the court by an affidavit.

In the case note to this case will be found many citations all implying that an affidavit setting forth the facts is all that is required. Beginning with page 231 of the note many cases will be found cited relating to record of criminal contempt and holding that no affidavit or information is necessary where the newspaper publication attacked the integrity of the court. In this note will be found many cases discussing the subject, and a discussion of the question of proceedings instituted by the prosecuting attorney, but in all these cases there is no intimation or holding that such a proceeding can be instituted only by an information filed by the prosecuting officer, consequently we must conclude that in any event the matter can be brought to the attention of the court by the affidavit of a private individual as well as by the information of the district attorney.

In the case of Carson v. Ennis, Ga. 92 S. E. 221, L. R. A. 1917E, page 650, the court held that in a case of constructive criminal contempt the proceeding could be instituted on an affidavit disclosing the state of facts relied on as establishing the contempt, or may be prosecuted by the solicitor general of the Circuit on the information of the relator, and that the relator need not have any private interest in the order alleged to have been contimaciously disobeyed.

Defendants' position is not strengthened, because, as the court in its judgment found the defendants guilty, the same finding would necessarily and naturally be made, or the proceeding so-called civil contempt.

As to the distinction between civil and criminal contempt: Some of the most distinguished jurists in the United States, including judges of the Supreme Court of the United States, have attempted to draw a satisfactory distinction between the two without success. Many courts have said that it is impossible to draw a line where the one begins and the other ends. In

each case, if there be a distinction, there is always present the contempt of the authorities of the court. The court issues an injunction enjoining a party from doing a given act. The injunction may be and probably is for the protection of the adversive party. The enjoined party violates the injunction and evidences his contempt of the authority of the court. He is hailed before the court to answer as to why he should not be punished · for contempt. If he is punished, it is noe because he has violated the rights of the other party to the cause, because the remedy by civil action would afford full redress for the violated rights. He is punished because he has violated the order of the court and has shown contempt for the authority of the court. It may be that the punishment, by way of a fine is directed to be paid to the party whose rights have been violated by reason of the breach of the injunction. It may be that the fine will be divided between the State and the party. The court, in its discretion, could require the whole of the fine to be paid to the State. In addition, the court can impose the jail sentence, as was done in the Verage case. Certainly no part of the jail sentence in that case enured to the benefit of the injured party. Defendants concede the lack of power to pardon for a civil contempt.

If it is an offense against the State, then clearly the Legislature, being invested by the constitution with legislative power, would have the right to limit, restrict, or take away from the courts the power to punish for contempt, both civil and criminal. The courts all hold, however, almost without exception that the general assembly is without authority to abridge the power of the court created by the constitution to punish contempts summarily, such power being inherent and necessary to the exercise of judicial functions. To this effect we cite the case of Hale v. State (Ohio) 36 L. R. A. 254, and the note. See also Carter v. Commonwealth (Va.) 45 L. R. A. 314; Smith v. Speed (Okla.) 55 L. R. A. 407. State ex rel Crow v. Shepherd, 177 Mo. 235; Venel v. Clancy, 30 Mont. 200; O'Neill v. People, 113 Ill. App. 200.

We desire to call the court's attention to an article in Harvard's Law Review, Vol. 25, No. 4 ,page 375, on "Nature of Criminal Contempt." Also a very able discussion of the subject of contempt of court, criminal and civil, by Joseph H. Beale, Jr., in 21 Harvard Law Review, No. 3, page 161. Also to a review of the Verage case, found in December, 1921, American Bar Association Journal, page 658, and to a very able and learned discussion of the "Constitutional Power of the President to Pardon Contempts of Court," found in 12 Law Notes, page 185, in which the author, Hon. Thomas J. Johnston, has reviewed the English decisions on the subject and thoroughly considered our Federal Constitutional provision concluding that the power does not exist.

MEMORANDUM OF AUTHORITIES USED IN ORAL ARGUMENT BEFORE THE COURT BY COUNSEL FOR THE STATE.

Statutory provisions cited on the power of Attorney-General and District Attorney.

Sections 1859-1860-1862-5321, Code of 1915.

Proceedings in contempt to vindicate the authority and to compel the respect of the court cannot be controlled in the District Court by the District Attorney, or in the Supreme Court by the Attorney General, as the case need not be brought in the name of the State.

13 C. J., 60; McDougal v. Sheridan, 23 Idaho 191, 128 Pac. 954; In re Chadwick, 109 Mich. 588, 67 N. W. 1071; In re Hughes, 8 N. M. 225; United States v. Territory of Arizona, 6 L. R. A. (NS) 572; Van Dyke v. Superior Court, 211 Pac. 588; Telegraph Newspaper Company v. Commonwealth, 44 L. R. A. 159; Commonwealth v. N. Y. C. & H. R. R. Co., 206 Mass. 422, 19 Ann. Cas. 529; Ex parte Duncan (Tex.), 182 S. W. 313, 2 A. L. R. 222; Carson v. Ennis (Ga.), 92 S. E. 221, L. R. A. 1917E, 650.

Contempt of court does not come within the definition of either a crime or misdemeanor when prose-

cuted by summary proceeding, and the proceeding is sui generis.

Blackstone's Commentaries, Vol. 4, page 5, Merinan v. Baker, 12 N. M. 451; Besette v. Conkey Company, 194 U. S. 324; Tyler v. Connolly, 2 Pac. 414; State v. Howell, 80 Conn. 668, 13 Amer. and Eng. Cac. 501; State v. Morrel, 16 Ark. 389; Cooper v. People, 13 Colo. 367.

Nor is it a criminal prosecution. State v. Howell, 80 Conn. 668, 13 Ann. Cas. 501; Jones v. Mould, 132 N. W. (Iowa) 45. In this case, while entitled as a civil case, nevertheless, the punishment inflicted was purely punitive and the fine was payable to the State. State v. Becht, 23 Minn. 411; Gibson v. Hutchinson. 126 N. W. 790, 148 Iowa 139; Ann. Cas. 1912B, 1007, and many other cases will be found in which it is characterized as an offense against the court. The majority of the courts hold that neither limitation nor latches bars a charge of contempt. Jones v. Mould, 159 Iowa 599; State ex rel Becht, 23 Minn. 411, Matheson v. Cnnor Schoell Kopf Co. 132 Fed. 836; Dale v. Roosevelt, 1 Paige 35; People ex rel Pratt, v. State (Kans.) 74 Hunn. 179; Middlebrook v. State, 43 Conn. 267.

There are three cases which hold that the statute of limitations does apply, viz.; Beattie v. People, 33 Ill. App. 61; Gordon v. Commonwealth, 141 Ky. 461, and Gompers v. U. S., 233 U. S. 604. But in these cases the court will find that the court, while applying the statute of limitations, was not clearly of the opinion that it did apply, but said that by analogy the same rule should be applied.

In the case of Gompers v. U. S., in an opinion by Justice Holmes to which Judges Vandeventer and Pitney dissented, it was distinctly held that a criminal contempt was a crime, and that the prosecution was a criminal prosecution, but a reading of the case will disclose that the holding was put upon the fact that a contempt of court was a misdemeanor at common

law, and the learned writer of the opinion evidently
lost sight of the fact that under the common law,
while a contempt of court constituted a misdemeanor
and might be punished as such, that in such case
the defendant was entitled to a trial by jury, and that
he could be prosecuted both for the misdemeanor and
by the summary process of attachment, and neither was
a bar to the other, and in denominating it as a crime
or as an offense against the United States all his rea-
soning falls when the distinction is observed between
the common law offense of contempt of court and the
summary proceeding by attachment which did not come
from the common law, but came into existence co-evil
with the creation of the court. It may be that a dis-
tinction under the Federal practice would be justified
upon the ground that Congress, which created the
Federal District Court, gave to such Courts the power
to punish for contempt by statute which regulated and
limited the power, and that such statute made it a
criminal offense, although we think this distinction is
not justified. In the case of Merchants Stock and
Grain Company v. Board of Trade of Chicago, 201
Fed. 20, the Circuit Court of Appeals of this Circuit,
in an opinion of great learning pointed out the reason
why a contempt of court were not crimes under the
5th Amendment, and are not criminal proceedings un-
der the 6th Amendment to the Federal Constitution.
After the decision in the Gompers case, in the case of
Creekmore v. U. S., 237 Fed. 743, the court of Ap-
peals of the same Circuit attempted to harmonize its
opinion in the Gompers case. But a reading of these
cases should convince a legally trained mind that the
opinion by Justice Holmes was erroneous. In the
Gompers case, Alton B. Parker was the leading coun-
sel for Gompers, and one of the principal points made
by this learned lawyer in support of his contention
that the statute of limitations applied because it was
a criminal case ,was that the power of pardon applied
to such cases, citing the two opinions of the Attorneys
General and the three cases relied upon by the appel-
lants herein, but the court, in passing upon the ques-

tion, did not even consider this point made and did not commit itself.

Statutes giving the court power to parole offenders convicted of certain crimes have no application to contempt cases. State, ex rel, v. Hume, Dist. Judge (Iowa) 188 N. W. 796. And see cases cited; all holding that contmept of court is not a criminal case.

Contempt of court is a misdemeanor at common law and may be prosecuted as such by indictment. Vol. 9, Laws of England, by Halsbury, page 501.

In England the distinction between criminal and civil contempt does not seem to be adhered to. Vol. 7, Laws of England, page 280.

See: Odgers on Libel and Slander, page 536; Willoughby on the Constitution, Section 750; Rawle on the Constitution, page 177; Story on the Constitution, Section 1503.

In Watson on the Constitution, page 941, the author says that there is a conflict of opinion whether the president has power to pardon for contempt of court. The author discusses very fully the case of In re Nevitt, and concludes that the power to pardon in contempt does not exist.

There is no moral wrong in a contempt of court. There is no public offense in the usual acceptation of that term. Every public offense carries with it a prescribed punishment. A contempt of court carries with it no fixed penalty, indeed the court may forgive the offense, and as usually happens when a party is cited for contempt of court, by his abject apology he moves the court to forgiveness. Taylor v. Goodrich (Tex.). Not so with an offense against the law. However contrite and humble the defendant may be, when he has committed a public offense, the law carries its own punishment, and the court must impose it. A contempt of court involves no moral turpitude, no public wrong. It consists in disrespect for the court. We care not whether it be denominated civil or criminal, always there is the outstanding element of disrespect for the

court, disrespect for its orders, or decrees, or an act calculated to bring the court itself into disrespect, or to interfere with the due administration of justice. The punishment is for the purpose of insuring respect and maintaining the confidence of the people in the tribunal dispensing justice. In the power of government here flowing from the people one department may not exercise any powers not expressly conferred upon it. How different it is in England where all power, executive, legislative and judicial resides in the King.

The power to punish for contempt of a court of record, created by the Constitution, is inherent in the court and it is not competent for the Legislature to abridge that power, because the power which the Legislature does not give it cannot take away.

This proposition is clearly established by all the modern authorities on the subject, and we call the court's attention to the case of Hale v. State (Ohio), 36 L. R. A. 254, and note to that case, and an examination of the decisions since this opinion will evidence that this is now the accepted doctrine.

If the Attorney General has the power to dismiss the motion to docket and affirm in the Supreme Court on appeal, it must follow that the District Attorney would have like power in the court of first instance, and if so, then the Legislature has conferred upon this official a power and right which it could not exercise by direct legislation.

Assuming, for the sake of argument, that this is a criminal case, and that the attorney general would be the only one who could move to docket and affirm, to the exclusion of the district attorney, nevertheless this duty upon the attorney general would be mandatory and not permissive. It will be noticed that the statute (Section 22, Chapter 43, Laws of 1917) uses the word "may" and must be construed as permissive with respect to private litigants; when, however, a public officer proceeds in a public case under this

statute, the word "may" must be construed "must." Catron v. Marron, 19 N. M. 200.

We call your attention also to section 53 of chapter 43, Laws of 1917, which clearly requires the clerk of the district court to transmit a skeleton record to the supreme court when the appellant fails to perfect his appeal. This is done entirely without the intervention of the attorney general and vests no duty on or discretion in him.

### OPINION OF THE COURT.

BRATTON, J. For the sake of convenience and clarity, we shall refer to the appellants as the defendants and to the appellee as the state.

The defendant Carl C. Magee was indicted, tried, and convicted in the district court of San Miguel county of the offense of criminal libel. While that case was pending against him, he was editor and manager and in control of a daily newspaper of general circulation throughout the state, published at Albuquerque, known as and called "New Mexico State Tribune," which was then owned by the defendant Magee Publishing Company, a corporation. During the pendency of that case, the defendant Magee wrote and signed certain articles which were printed, published, and circulated in the said New Mexico State Tribune, wherein various phases of such libel case were discussed and great criticism directed against the presiding judge of the Fourth judicial district, which includes San Miguel county. Shortly theerafter the informations in the four cases now before us were filed by the state, acting through the district attorney of that district, charging that the defendants had thereby committed contempt of court. They were tried and convicted in each case. The defendant Magee was sentenced to serve terms in jail aggregating one year and to pay nominal fines. Fines aggregating $4,050 were imposed upon the defendant Magee Publishing Company. Both defendants prayed and were granted appeals from such convictions and sentences. After such ap-

peals had been granted and before the time required by law to perfect them had expired, the Governor granted to each defendant full and complete pardons in each and all of the cases, on account of which no further steps were taken to perfect such appeals. After the return day of such appeals had expired, the state, through said district attorney, joined by private counsel, presented skeleton transcripts in each of these cases and moved that they be docketed and affirmed. We granted the motions in so far as they prayed that the cases be docketed. The defendants thereupon appeared, and now resist the affirmance of the judgments, contending that by virtue of such pardons they are relieved and absolved from all liability to serve the jail sentence or to pay the fines imposed upon them. The district attorney and counsel associated with him, on the other hand, vigorously assert that such pardons are void because the Governor has no power to pardon for contempt of court.

After the issue had been thus formed, the Attorney General interposed a motion in each case to dismiss. Several grounds were assigned, among others, that the Governor had the power to pardon the defendants; that the pardons are valid and hence the state cannot further maintain the prosecution. As this went to the life of the cases and involved the vital questions being litigated, we took such motions under advisement to be determined along with the cases upon their merits.

The four cases were briefed and submitted by counsel in consolidated form, and as the questions involved in all of them are identical, we will decide them in the same manner.

[1] The power of courts to punish for contempts is inherent. Its existence is essential to the preservation of order in judicial proceedings and to the enforcement of obedience to their writs, orders, and mandates, and consequently to the due administration of justice. The exercise of this power is as old as the English his-

tory itself and has always been regarded as a neces-
sary incident and attribute of courts. Being a common-
law power, inherent in all courts, the moment the
courts of the United States were called into existence
they became vested with it. It is a power coming to
us from the common law and, so far as we know,
has been universally admitted and recognized.  4
(Lewis) Black. Com. § 286, p. 1675; Oswald on Con-
tempt (Canadian Ed.) pp. 1-3; 6 R. C. L. 489; State
v. Morrill, 16 Ark. 390; State ex rel. Rodd v. Verage,
177 Wis. 295, 187 N. W. 830, 23 A. L. R. 491; and
People ex rel. Brundage v. Peters, 305 Ill. 223, 137 N.
E. 118, 26 A. L. R. 16. A splendid review of the origin
and history of such power, supported by a wealth of
authority, as well as its universal recognition, both at
common law and in the United States, may be found in
State v. Shepard, 177 Mo. 205, 76 S. W. 79, 99 Am.
St. Rep. 624, to which the bar is referred.

[2] Such contempts are divided into two classes,
civil and criminal, and it naturally becomes necessary
for us to determine at the outset into which class these
cases fall. Much has been said by distinguished jurists
concerning the distinction between the two, and many
rules for such determination have been evolved, from
which it appears that the line of demarcation is often
and frequently narrow, shadowy, indistinct, and diffi-
cult to ascertain, with the result that it is not always
easy to classify a particular act as belonging to either
one of the two classes. In fact, it may sometimes
partake of the characteristics of both. Without launch-
ing into any prolix discussion upon the subject, or at-
tempting to resort to any superfine distinctions, we
think it may be said generally that "civil contempt"
includes all those proceedings in the nature of con-
tempt, instituted to preserve and enforce the rights of
private parties to suits, and to compel obedience to the
orders, writs, mandates, and decrees which are made
to enforce the rights as well as to administer the rem-
edies to which such parties are entitled; the offense
is committed when a person fails or refuses to do

something which he has been ordered to do for the benefit of an opposite party litigant, the punishment for which is imposed to coerce the performance of such act. Such punishment is remedial in character and is for the protection of the party whose rights have been violated. Such orders and commitments are made and issued for the sole purpose of committing the offender until he yields obedience to the order which he has violated, while "criminal contempt" embraces all acts committed against the majesty of the law, or, to clothe the thought in other language, is may be said to include those acts done in disrespect of the court, or which obstruct the due and proper administration of justice, or which tend to bring the court into disrepute in the form of public opinion. It has been said that the term implies an offense against organized society. Costilla Land & Inv. Co. v. Allen et al., 15 N. M. 528, 110 Pac. 847; In re Nevitt, 117 Fed. 448, 54 C. C. A. 622; Clay v. Waters, 178 Fed. 385, 101 C. C. A. 645, 21 Ann. Cas. 897; Bessette v. Conkey Co., 194 U. S. 324, 24 Sup. Ct. 665, 48 L. Ed. 997; Gompers v. Buck's Stove & Range Co., 221 U. S. 418, 31 Sup. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874; Ex parte Gudenoge, 2 Okl. Cr. 110, 100 Pac. 39; Flathers v. State, 7 Okl. Cr. 668, 125 Pac. 902; Burnett et al. v. State, 8 Okl. Cr. 639, 129 Pac. 1110, 47 L. R. A. (N. S.) 1175; Ex parte Mettler, 50 Mont 299, 146 Pac. 747; State ex rel. Hammer v. Downing, 40 Or. 309, 58 Pac. 863, 66 Pac. 917; Red River Potato Grower's Ass'n v. Bernardy et al., 128 Minn. 153, 150 N. W. 383; Staley v. South Jersey Realty Co., 83 N. J. Eq. 300, 90 Atl. 1042, L. R. A. 1917B, 113, Ann. Cas. 1916B, 955; People ex rel. Brundage v. Peters, 305 Ill. 223, 137 N. E. 118, 26 A. L. R. 16, and Van Dyke et al. v. Superior Court et al., 24 Ariz. 508, 211 Pac. 576.

[3] With these distinctive features in mind, it becomes easy to classify the acts charged in the information in each of these cases, as they are free from those conditions which frequently present so much difficulty.

No order has been made by the court directing or commanding the defendants, or either of them, to do or refrain from doing anything; they had violated no writ, mandate, or decree; the rights of no opposite party litigant had been overridden; the object or purpose of the punishment imposed was not to coerce performance of any act, or to compel them to yield obedience to any command whatsoever, but was solely punitive in character for the purpose of vindicating the majesty of the law and to bring about respect for the court. They were, therefore, clearly criminal contempts.

With this preliminary question disposed of, and having determined that the information charged the defendants with criminal contempt, we approach the decisive question in the case, namely, does a conviction and punishment upon such a charge come within the pardoning power of the Governor? We shall enter our investigation and consideration, and reach our conclusion, mindful of the delicacy of the question presented and with a due appreciation of the deference which each of the three co-ordinate departments of our government—the Executive, the Legislative and the Judiciary—owes to the other. While each department is supreme within its own field of action, it should be always considerate of and loath to criticise or endeavor to interfere with either of the other two.

[4] A review of the source of the pardoning power, as well as its origin and history, reveals that at common law it was vested in the king; it was one of the rights, attributes, and prerogatives of the crown. The king in his coronation oath obligated himself in this language: "That he will cause justice to be executed in mercy." 4 Black. Com. § 396; 20 R. C. L. Pardon, §§ 5, 24; Ex parte Wells, 18 How. 307, 15 L. Ed. 421; Ex parte Bustillos, 26 N. M. 450, 194 Pac. 886. Such power, however, was not unrestricted at common law, as certain statutes were enacted throwing regulations, limitations, and restrictions around its exercise. 4 Black. Com. § 399; Ex parte Wells, supra.

[5] The same consideration which evoked the exercise of this power in England caused the United States, as well as most, if not all, of the states of the Union, to vest the same power in some branch of its government. In the United States it is vested in the President. Article 2, U. S. Constitution. Most of the states have, by constitutional provisions, conferred it upon the Governor, as the head of the executive department is generally believed by the American people to be usually so self-restrained, so conscious of and imbued with the responsibilities of his high office, that the power so vested will be rightly, discreetly, and properly used, free from abuse, and exercised solely in the best interest of the entire people of the state, to the exclusion of all improper, sordid, or ulterior motives. Ex parte Bustillos, supra. This power is granted to the Governor of this state by section 6 of article 5 of the Constitution, which provides:

"Subject to such regulations as may be prescribed by law, the Governor shall have power to grant reprieves and pardons, after conviction for all offenses except treason and in case of impeachment."

Such constitutional provision constitutes a plain and clear grant of power to grant pardons, after conviction, except in cases of treason and impeachment. Save for these, the Governor has the undeniable power to grant pardons, after conviction, for all offenses. It remains, therefore, to determine whether criminal contempt is an offense within the purview of this constitutional provision. We may, with profit, remind ourselves that at common law criminal contempt was an offense punishable in a summary proceeding (4 [Lewis] Black. Com. chapter 30), and, being an offense, was pardonable at the hands of the king (4 Black. Com., chapter 31). The texts, with little in harmony, agree that it is an offense, and, as such, comes within the pardoning power of the Governor under constitutional provisions quite similar to ours.

In 13 C. J. "Contempt," § 154, it is said:

"Since punishment for contempt of court is not inflicted out of any personal consideration for the judge, but only

to uphold the authority and dignity of the law, an order of the judge inflicting punishment for contempt is within the range of the pardoning prerogatives vested in the executive, and it has been held that the pardoning power of the President extends to cases of contempt; but it has also been held that the pardoning power of the President extends to cases of contempt; but it has also been held that the pardoning power of the President does not extend to punishment inflicted to compel obedience to an order of court made in a civil suit for the benefit of one of the parties to the suit."

And in 20 R. C. L. 537, this rule is thus declared:

"That the offense arising from a contempt of the authority of a court is one which, from its nature, should be summarily punished, to the end that an efficient and wholesome exercise of judicial powers may be had, no one will question. But a contempt of court is an offense against the state and not an offense against the judge personally. in such a case the state is the offended party, and it belongs to the state, acting through another department of its government, to pardon or not to pardon, at its discretion, the offender. And the generally accepted rule is that the pardoning power extends to cases of imprisonment for contempt of court."

Mr. McClain, in volume 1 of his work on Criminal Law, at page 11, says:

"Courts have power to punish as contempts any interference with their proceedings or resistance of their authority. This is a power inherent in courts of superior juisdiction and essential to their existence. It is not simply an incident to the exercise of judicial functions, but is the highest exercise of judicial power. Contempts are sometimes spoken of as criminal when they involve interference with the action of the court, and civil, when they are an injury to a private party by reason of the violation of some order or proceeding of the court to protect his rights. Criminal contempts may be punishable by fine and imprisonment, even though imprisonment for debt is prohibited. In such cases there is no constitutional right to jury trial, or to be confronted by the witnesses against him, but the defendant may be relieved from punishment by executive pardon, as in case of conviction for crime. The procedure is governed by the analogies of a criminal prosecution, and it is said the imposition of a fine in such case is a judgment in a criminal case."

To the same effect are 1 Bishop, Crimin. Law, p. 555, and Rapalje on Contempt, § 162.

These texts, all of which are standard authorities,

are founded upon a limited number of decisions, which
we will consider. The first case to arise in any of
the states involving this question was Ex parte Hickey,
4 Smedes & M. (Miss.) 751. The facts there were
quite similar to those involved here. There the relator
was editor of a certain newspaper in which he printed,
published, and circulated an article wherein the acts
and conduct of the presiding judge of the court then
in session, with reference to a certain murder case
pending in said court, were discussed and criticized.
He was convicted of criminal contempt and sentenced
to serve a term of five months in jail and to pay a
fine of $500. He received a pardon and was released
from custody. Thereupon the court issued a bench
warrant upon which he was again taken into custody,
and immediately thereafter sought a writ of habeas
corpus from the Supreme Court. The sole question
involved and decided concerned the validity of the
pardon. The Constitution of the state of Mississippi
(Const. 1832, art. 5, § 10) bestowed upon the Gov-
ernor the ''power to grant reprieves and pardons,
and to remit fines in all criminal and penal cases,
except in those of treason and impeachment.''

The court there held that wrongs are of two
classes, public and private. That private wrongs are
those which infringe upon the rights of individuals
in their individual capacity, and that publc wrongs
are those which violate the rights which the in-
dividual owes to the entire community, when con-
sidered as a social entity. After declaring this dis-
tinction between the two classes of wrongs, it was
held that criminal contempt came within the latter
and that it was a crime within the contemplation
of the constitutional provision quoted, and hence with-
in the range of the pardoning power. It was further
pointed out that it differed from the ordinary criminal
case, in that no jury trial was guaranteed, but it was
nevertheless of that degree of public wrong as to fall
within the pardoning power granted by the Constitu-
tion. It was said in that case:

"But it has been insisted by counsel that contempts of court do not come under the class of criminal or penal cases. The attachment which issues upon the information of a contempt is a criminal process. 1 Tidd, Prac. 401. 4 Bla. Comm. 231, calls the offense 'a criminal charge.' 'A crime, or misdemeanor, is an act committed, or omitted, in violation of a public law, either forbidding or commanding it.' 4 Bla. Comm. 5. The distinction of public wrongs from private, of crimes and misdemeanors from civil injuries, seems principally to consist in this, that private wrongs or civil injuries are an infringement or privation of the civil rights which belong to individuals, considered merely as individuals, public wrongs, or crimes and misdemeanors, are a breach and violation of public rights and duties, due to the whole community, considered as a community in its social, aggregate capacity. Ib. 6 Contempts of court are treated by all elementary writers as public wrongs. They are distinguished from ordinary crimes or misdemeanors, because in their punishment there is no intervention of a jury, the party being acquitted or condemned by the suffrage of such person only as the statute has appointed for his judge. Ib. 279, tit. Summary Conviction. In short, the whole doctrine of contempts goes to the point that the offense is a wrong to the public, not to the person of the functionary to whom it is offered, considered merely as an individual. It follows then, that the contempts of court are either crimes or misdemeanors in proportion to the aggaravation of the offense, and as such, are included within the pardoning power of this state."

The case is directly in point with reference to both the law and the facts. The constituional provision which confers the pardoning power upon the Governor is, in effect, similar to the Constitution of this state, and the facts there involved were so nearly identical with those involved in the cases before us that the principles of law declared there are applicable here.

The next case which assumed to discuss and decide the right to pardon for contempt was State v. Sauvinet, 24 La. Ann. 119, 13 Am. Rep. 115. In that case a writ of sequestration had issued whereby it was sought to recover from the possession of the relator Sauvinet a certain cash box with its contents which he declined to surrender in obedience to the commands of the writ. He was adjudged to be in contempt for which punishment was imposed. The Governor granted him

a pardon, but the sheriff declined to release him from custody, because said sheriff conceived that the pardoning power did not extend to such a case; whereupon he instituted proceedings in habaes corpus to secure his liberty. The whole case revolved around the validity of such pardon, which depended upon the power of the Governor to pardon for contempt of court. A clear distinction between civil and criminal contempt is not drawn in the opinion in that case, but it is declared in general terms that contempt of court is an offense against the state and not against the judge of the court personally, and that the state, being the offended party, had the right to grant a remission of that offense by a pardon duly granted through another department of its government—the executive. The state contends such case is not authority here because it clearly appears that it involved civil contempt. As we have previously stated, the court did not seem to clearly distinguish between the two classes of contempts, and while it may be argued with great force that the facts involved in that case constituted civil contempt, it seems that the court did not so treat it, but, to the contrary, regarded it as criminal contempt. This appears from the following language to be found in the opinion:

"It is proper to add, that Lewis, the plaintiff in sequestration, has no interest or right of property in the punishment inflicted. It is no concern of his, but concerns the state alone; and the rule therefore, that when a private person (as an informer for example) has acquired a right of property in a penalty, the executive cannot pardon, can have no application to this case."

In Sharp v. State, 102 Tenn. 9, 49 S. W. 752, 43 L. R. A. 788, 73 Am. St. Rep. 851, the relator had been adjudged guilty of contempt of court for endeavoring to influence the sheriff to summon certain persons to serve as jurors in a case in which the relator's son was being tried upon a charge of making false and fraudulent entries in the books of his employers. The relator secured from the Governor a pardon, which the presiding judge of the court refused to recognize up-

on the theory that the pardoning power did not exist in such a case. The court held that such power did exist under section 6 of article 3 of the Constitution, which vested the pardoning power in the Governor in this language:

"He shall have power to grant reprieves and pardons after conviction, except in cases of impeachment."

No discussion will be found in that opinion concerning the distinction between civil and criminal contempt, but we think it indubitably appears that it was criminal rather than civil contempt. The action of the relator in attempting to influence the sheriff to summon certain persons to serve upon the jury was merely an act calculated to impede or obstruct the due administration of justice. It violated no order, mandate, or decree of the court. Neither did the relator fail or refuse to do something which the court had ordered or commanded him to do, and the punishment imposed was not to coerce compliance with any such order or mandate, nor to force him to yield obedience to any process of the court, but was purely punitive in character to prevent a reptition of such conduct. It was therefore clearly criminal contempt, and was held by that court to come within the pardoning power under a constitutional provision almost identical with ours.

[6] The provision of the Constitution of the United States which vests the pardoning power in the President is quite similar to the provision contained in the Constitution of this state vesting such power in the Governor. It is in this language:

"He shall have power to grant reprieves and pardons for offenses against the United States, except in cases of impeachment," Article 2, U. S. Constitution.

The only differences between the two are that under the Constitution of this state, such power can be exercised only after conviction, and treason is expected; whereas, such limitation and exception are not to be

found in the Constitution of the United States..
Otherwise, the two provisions are identical. In re
Mullee, 7 Blatchf. 23, Fed. Cas. No. 9911, the relator
had been adjudged guilty of contempt for violating
a writ of injunction, and had been fined therefor.
After being confined for some time (in default of
paying such fine), he presented to the court his peti-
tion seeking his release from custody. The court held
that it was without power to release him; that such
power was vested exclusively in the President to
grant the same by pardon. It was expressly held that
contempt of court is an offense within the terms of
the constitutional provision quoted. The court said:

"A contempt of court is an offense against the United
States. In the present case, there is a judgment judicially
declaring the contempt an offense. In Ex parte Kearney
(7 Wheaton [20 U. S.] 38, 43), the Supreme Court
says: 'When a court commits a party for a contempt,
their adudication is a conviction, and their commitment
in consequence is execution.' After a conviction and a
commitment for a contempt, the court has no more power
to discharge or remit the sentence  than it has in the
case of a  conviction and a  commitment  for  any  other
crime or offense against the United States.  And such
has been the practical construction of the provision of
the Constitution in regard to pardons. In the case of one
Dixon, a fine was imposed upon him by the Circuit Court
of the United States for the District of Mississippi, for
a contempt of court.  He applied to the President for a
pardon.  The Attorney General, Mr. Gilpin (3 Op. Attys.
Gen. 622), decided that the pardoning power extended to
such a case, and that the contempt was an offense within
the language of the provision of the Constitution.  I
fully concur in this view; and it necessarily follows, that,
if the power of relieving from the sentence imposed on
Mullee falls within the pardoning power of the President,
it is exclusive in the President, and cannot be exercised by
this court."

That Judge Blatchford regarded the case as one
embracing criminal contempt is fully disclosed from
his opinion. This language is to be found near its
close.

"The contempt of court was an offense against the
United States, and the fine was inflicted as a punish-
ment therefor."

Moreover, he cites with approval, and in a large measure bases his conclusion upon what is referred to as the Dixon Case (3 Op. Attys. Gen. 622), wherein Dixon was punished for contempt committed by an affray had in the presence of the Circuit Court of the United States for the District of Mississippi, which was undeniable criminal contempt; and, we pause to suggest, the opinion further discloses that Justice McKinley, then associate justice of the United States whose circuit embraced the district of Mississippi, recommended the pardon at the hands of the President. This may be regarded as a reflection of the views entertained by Justice McKinley with reference to the pardoning power in cases of that and this class. Before leaving the Mullee Case, it has been suggested that its force is weakened because Judge Blatchford in the later case of Fisher v. Hayes (C. C.) 6 Fed. 63, abandoned his original position. The most that can be said is that he receeded from the position that a violation of an injunction writ constituted criminal contempt. In the later case, he regarded such facts as constituting civil contempt; but he never even intimated that he doubted his position taken in the Mullee Case concerning the power of the President to pardon for criminal contempt.

While the opinions of the Attorney General of the United States are neither precedent nor controlling they may be considered as persuasive, especially upon a subject of this kind, which has been so infrequently decided by courts. It has been held in three different instances by Attorneys General of the United States that the President has the power, derived from the above-quoted constitutional provision, to pardon for criminal contempt. 3 Op. Attys. Gen. 622; 4 Op. Attys. Gen. 317; 4 Op. Attys. Gen 458.

Perhaps the strongest case construing this kind of charge is Gompers v. United States, 233 U. S. 604, 34 Sup. Ct. 693, 58 L. Ed. 1115, Ann. Cas. 1915D, 1044. In that case, the proceedings were in the nature of a criminal contempt to punish for past acts

done in violation of a writ of injunction, not to se-
cure obedience in the future.  The defendant pleaded
the statute of limitations which is in this language:

"No person shall be prosecuted, tried, or punished for
any offense, not capital, except as provided in section
one thousand and forty-six, unless the indictment is found,
or the information is instituted within three years next
after such offense shall have been committed.  But this
act shall not have effect to authorize the prosecution, trial
or punishment for any offense, barred by the provisions
of existing laws."  Rev. St. § 1044;  19 Stat. 32 (U. S.
Comp. St. § 1708).

It is to be noted that the limitation applies to
"offenses," being the word used in the Constitution
of the state governing the pardoning power.  This
fact, when considered in connection with the further
fact that it is construed by the highest court of the
land, makes the case of peculiar interest and of
controlling force.  It was argued that criminal con-
tempts did not come within the purview of the stat-
ute because they were not offenses.  The court ex-
pressly held otherwise, saying if they were not crim-
inal we are in error as to the most fundamental char-
acteristic of crimes as that word has been understood
in the English speech.  This pertinent language was
there used:

"It is urged in the first place that contempts cannot
be crimes, because, although punishable by imprisonment
and therefore, if crimes, infamous, they are not within
the protection of the Constitution and the amendments
giving a right to trial by ury, etc., to persons charged
with such crimes.  But the provisions of the Constitu-
tion are not mathematical formulas having their essence
in their form; they are organic living institutions trans-
planted from English soil.  Their significance is vital not
formal; it is to be gathered not simply by taking the
words and a dictionary, but by considering their origin
and the line of their growth.  Robertson v. Baldwin, 165
U. S. 275, 281, 282.  It does not follow that contempts of
the class under consideration are not crimes, or rather,
in the language of the statute, offenses, because trial by
jury as it has been gradually worked out and fought out
has been thought not to extend to them as a matter of
constitutional right.  These contempts are infractions of
the law, visited with punishment as such.  If such acts
are not criminal, we are in error as to the most funda-

mental characteristics of crimes as that word has been understood in English speech. So truly are they crimes that it seems to be proved that in the early law they were punished only by the usual criminal procedure, 3 Transactions of the Royal Historical Society, N. S. p. 147 (1885), and that at least in England it seems that they still may be and preferably are tried in that way."

Later, and with particular reference to whether such proceedings came within the statute of limitations concerning ''offenses,'' the court said:

"Even if the statute does not cover the case by its express words, as we think it does, still, in dealing with the punishment of crime a rule should be laid down, if not by Congress by this court."

We consider this case far more than persuasive—it is decisive. If criminal contempt is an ''offense'' within the statute of limitations of the United States, we cannot appreciate why it is not embraced within the constitutional provision which vests the power in the government to pardon for ''all offenses, except treason and in cases of impeachment.'' How can it be said that it is an offense in one instance and not in the other?

Counsel for the state have strongly urged upon us the cases of Re Nevitt, 117 Fed. 448, 54 C. C. A. 662, and State ex rel. Rodd v. Verage, 177 Wis. 295, 187 N. W. 830, 23 A. L. R. 491, as two of the leading cases which deny the right to pardon. A casual reading of these demonstrates that in each instance the court determined that the facts set forth constituted civil contempt. All that is said with reference to the pardoning power in cases of criminal contempt is purely dictum and was so regarded by the writers. This is particularly apparent from the language used by Judge Sanborn in the Nevitt Case:

"It is not, however, necessary to a decision of the application before us, nor is it our purpose, to here decide whether or not criminal contempts, contempts instituted solely for the purpose of vindicating the dignity of the courts, preserving their power, and punishing disobedience of their orders, fall within the pardoning power of the executive."

It is equally apparent in State ex rel, Rodd v. Verage, by the use of this language:

"This disposes of the case without reaching the question whether the Governor has power to pardon in criminal contempt cases; that is, where the punishment is inflicted for purely punitive purposes and to expiate the contemner's public offense. This is a very interesting question, and one to which we have devoted no little thought and consideration. It may be said to be an unsettled question in this country, as instances of its judicial consiedration are rare."

What is said upon the subject is, therefore, neither precedent nor authority; at most, it can be considered in the nature of texts.

We have carefully considered the further case of Taylor v. Goodrich, 25 Tex. Civ. App. 109, 40 S. W. 515, which is strongly relied upon by counsel for the state. While the court expressly denied the power of the Governor to pardon for criminal contempt, we think the conclusion reached was based upon the peculiarity of the constitutional and statutory provisions of that state which differ from the constitutional provision of this state which we now have under consideration. The Constitution of Texas vested the power in the Governor to pardon in all "criminal cases," except treason and impeachment. Originally the common law with regard to crimes, where not abrogated by statute, was in force there. Grinder v. State, 2 Tex. 338. Later, and with the design of enacting into Code form every offense against the laws of that state, a complete system of penal laws was adopted with the sweeping provision that no person should be punished for any act or omission unless the same was made penal and a penalty affixed therefor in and by said Code. These statutory provisions are to be found in articles 1, 2, and 3 of the Penal Code of that state, which so provide thusly:

"The design of enacting this Code is to define in plain language every offense against the laws of this state, and affix to each offense its proper punishment."   Article 1.

"The object of punishment is to suppress crime and reform the offender." Article 2.

"In order that the system of penal law in force in this state may be complete within itself, and that no system of foreign laws, written or unwritten, may be appealed to, it is declared that no person shall be punished for any act or omission, unless the same is made a penal offense, and a penalty is affixed thereto by the written law of this state." Article 3.

Since the enactment of such Penal Code, it has been uniformly held in that state that no act constitutes a crime for which punishment may be imposed, unless expressly denounced by the terms of the Code and a penalty affixed therefor. In other words, no other law regarding crimes or offenses is known in that state. Scott v. State, 86 Tex. 321, 24 S. W. 789; Ex parte Ligenfelter, 64 Tex. Cr. App. 130, 142 S. W. 555, Ann. Cas. 1914C, 765.

With this in view as the settled law of the state, the court held (in Taylor v. Goodrich), and rightly so, we think, that the term "criminal cases," as used in the constitutional provision vesting the pardoning power in the Governor, meant and referred to those crimes provided for in the Criminal Code, and that criminal contempt was nowhere mentioned in such Code; hence an action to punish for such an offense was not a "criminal case." We quote from the language adopted by that court in expressing its views which resulted in such conclusion:

"If the words 'criminal case' are confined to the crimes mentioned in the Penal Code and should be held to be construed only as the terms crime and offense are therein defined, there would be little difficulty in reaching a correct conclusion upon this question, for the question of contempt is not mentioned in the Penal Code and is not there characterized as a crime or offense. * * * And it is believed, as before stated that the term 'criminal cases,' as there used, was intended to be understood as meaning those cases and crimes provided for in the Criminal Code, for which a conviction must be had in the manner provided by law for the trial of criminal cases."

This is not the rule here, and no such restrictions have been promulgated by statute or rule of decision.

The common law of crimes is in force in this state, except where it may have been modified or repealed by statute, and the common-law procedure in criminal cases is in force, except where special provision is made by statute to the exclusion of the common law. Territory v. Montoya, 17 N. M. 122, 125 Pac. 622; Ex parte De Vore, 18 N. M. 246, 136 Pac. 47. For the reasons stated, the three cases cited and relied upon by the state cannot be considered as precedent or authority for its contention that the pardoning power does not extend to cases of this kind. Aside from them, we have been referred to no case, and we have been unable to find one which does sustain such contention. On the contrary, the weight of authority supports the contention of the appellants.

We pause here to give expression to one other thought which we have taken into consideration. It has occurred to us that if the word "offense," as used in the Constitution, was intended to be limited to its narrow sense of embracing only strictly criminal or penal cases, in which the right to trial by jury, and to be confronted with the witnesses and many similar characteristics attending such criminal or penal cases were guaranteed, impeachment would not have been expressly excepted from its terms. That is certainly not an ordinary or strict criminal proceeding. The charge is not presented by indictment or information. Trial by jury is not guaranteed. A conviction therefor is not followed by either fine or imprisonment. And yet it was deemed advisable to expressly except it from the operation of the constitutional provision in question, which clearly indicates that it was never thought or intended that the term "offenses" should be so limited; but that it should cover a wider field.

From all that has been said, we have reached the firm conclusion that criminal contempt is an offense arising from a contumacious act against the authority of the court and is not one against the presiding judge personally. In such an instance, the judge

merely represents the sovereignty in the realm of its judicial department of government. The offense is therefore one against the community when considered as a social entity—it is one against the state, and the state, being the offended party, has the power to extend grace or forgiveness. That power is exercised through another department of the government, namely, the executive, and when he has granted the same, the subject is freed and the incident closed. In the first instance the soverign state is represented by its judicial department, acting through the particular court against which the contumacy is directed, and in the second instance, by the executive department, acting through the Governor.

In our investigation of this case, which has consumed no little of our time, patience, and research, we have given due consideration to the urgent contentions of counsel for the state that a construction of the Constitution giving to the Governor the right to pardon in this kind of cases will result in making the courts weak, ineffective, impotent, and vassal; that, while the executive department could not influence their actions and determinations, it could control their effect. In fact, all of the considerations suggested in the Nevitt, Rodd v. Verage, and Taylor v. Goodrich Cases, have been brought forward and pressed upon us with great zeal by counsel in their presentation of the case upon behalf of the state, and we have not minimized their effect. Neither have we failed to seriously consider the argument that this is not an offense by reason of numerous distinctive features, wherein it is different from the ordinary criminal case. Among others, it is suggested that a trial by jury is not guaranteed. This is completely answered by the Supreme Court of the United States in Gompers v. U. S., supra. Many other distinctions are suggested. None of them are more forcible. In response, it is trite to say that the power to pardon is not inherent in any official, board, or body. It is vested in the sovereign people, and they have the power to repose it in any official or body which they can deem wise and expedient.

In this state, it has been vested in the Governor. The people, in the adoption of the Constitution, reposed it in that officer. With the wisdom of such action we are not concerned. Neither does the wisdom nor propriety of its exercise by that department of the state enter into the case. When we have determined that the power is vested in the Governor, our connection with the matter ceases, as courts exist for the purpose of construing and enforcing laws, not to make them.

We shall not further lengthen this opinion by added discussion. It is perhaps too long now. Before closing, we desire to say that counsel have carefully, thoroughly, painstakingly, and scientifically presented the various considerations entering into its decision, and we have been greatly assisted by their able arguments and briefs.

It follows that the motion of the state, acting through its district attorney and private counsel, in so far as they pray an affirmance of the several judgments, must be denied; and that the motion of the Attorney General praying that they be dismissed because the pardons were valid and effective, and barred any further prosecution, must be sustained, and the cases therefore dismissed. And it is so ordered.

BOTTS, J., concurs.

RYAN, District Judge (dissenting). I am unable to concur in the conclusion reached by the majority of the court; and inasmuch as the question proposed for decision involves the construction of the state Constitution and such construction determines the existence of power as between the executive and the judicial departments of the government, I conceive that a statement of the reasons that lead to such dissent appropriately reflects both the importance and the delicacy of what is decided.

There is really only one question in the case. It is: Does section 6 of article 5 of the state Constitution, viz., "Subject to such regulations as may be

prescribed by law, the Governor shall have power to grant reprieves and pardons, after conviction for all offenses except treason and in cases of impeachment,'' warrant the exercise of the pardoning power by the Governor upon a conviction for criminal contempt as maintained by the state? If answered in the affirmative, there is an end to the question; for in that case what may be thought of the wisdom of so vesting the power, or indeed of the exercise of it in any given case, becomes at once irrelevant; and it devolves upon the judiciary to defer to the assertion of the power at every point of contact. On the other hand, if answered in the negative, the act of the Executive considered in this case was a futile gesture, destitute of legal effect.

The question is not, unhappily, one of such simplicity that it may be settled readily on an inspection of the constitutional provision referred to; this is apparent from the exhaustive study of authorities and the careful analysis of the main and incidental question evidenced by the opinion of the court, the concurring in which by my colleagues in this case of itself lends great weight to the conclusion evolved.

An element usually attended with doubt in the cases cited is settled here; the contempt in this case is a criminal contempt. Also, the argument may be rescued from confusion by holding firmly to the fact that the proceedings here involved were summary in character, as distinguished from ordinary proceedings under the Criminal Code, which latter plainly have to do with a crime in the usual acceptance of the term, to which the pardoning power of the Governor undoubtedly extends.

The argument of the court, compressed to brevity, comes to this: All precedent and authority supports the affirmative of the question. The contrary doctrine is found only in cases in which what was so said was unnecessary to the decision of the court, hence, being mere obiter dictum, lacks persuasiveness. The texts cited by the court, in that they rest upon the

cases that the court follows, of course add nothing as authority.

The cases accepted as authority are Ex parte Hickey, 4 Smedes & M. (Miss.) 751; State ex rel. Van Orden v. Sauvinet, 24 La. Ann. 119, 13 Am. Rep. 115; Sharp v. State, 102 Tenn. 9, 49 S. W. 752, 43 L. R. A. 788, 73 Am. St. Rep. 851; Re Mullee, 7 Blatchf. 23, Fed. Cas. No. 9, 911.

These are the facts in Ex parte Hickey, decided in 1844. While the circuit court for one of the counties of Mississippi was in session, the grand jury returned an indictment for murder against a certain defendant. Upon the returning of the indictment, the presiding judge of the court, ignoring the advice of the district attorney, refused to order the issuance of a bench warrant for the defendant, on the ground that he was already under bail and further proceedings to secure his attendance upon court unnecessary. The fact that the defendant was thus allowed to go at large, the crime with which he was charged being one that .provoked considerable feeling in the community, prompted Hickey, who was the editor of a local newspaper, to write and publish therein an editorial which viciously abused the presiding judge for gross official misconduct. For this Hickey was tried by the court as for a criminal contempt and sentenced to jail for five months and to pay a fine in the sum of $500. Immediately thereafter, the Governor of the state granted to the contemner a full and complete pardon. Thereupon the judge ordered a bench warrant against the contemner, who under it was rearrested and made to serve the sentence imposed, notwithstanding the pardon of the Governor. The contemner then brought habeas corpus proceedings in the Supreme Court of the state to determine his right to liberty; and it was in regard to the efficacy of the writ upon the return made thereto by the sheriff reciting the above facts, that the opinion of the court now considered was rendered. A matter of procedure disposed of in favor of the relator, the court

considered in order three questions, determinative of the relator's right to liberty: First, whether the court had jurisdiction to sentence for consequential contempt; second, whether, if so, the sentence actually imposed was valid; third, the power of the Governor to pardon. Obviously if either or both of the first two questions were resolved in favor of the prisoner, he was entitled to his liberty, and if both against him he would nevertheless prevail if the pardon was upheld.

The reasoning of the court to the first question from historical development, from the adjudicated cases, and from the statements of eminent commentators, it is unimportant to review. The court concluded that the exercise of such power was unknown to the common law and hence did not exist. It said:

"The proposition which is thus laid down is, that the doctrine of consequential contempts, in its present broad understanding, was unknown to and not confirmed by the earliest cotistutional law of England—Magna Charta."

That the English and some American courts claimed the right to punish for consequential contempts, the court admitted; but the assertion of such right, it said, was a mere assumption of power which they did not possess. And if as to this there were any doubts the Constitution of the state set them at rest. The constitutional provisions referred to were the Bill of Rights similar to those in most Constitutions, and the provision as to the freedom of the press, viz.:

"Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

So the court concludes, denying the· jurisdiction of the trial court to punish for consequential contempt:

"The reflections of the petitioner upon the circuit judge of Warren county, as set forth in the petition complained of, when judged by the practice and assumptions of the English, and some of the American courts, constitute an undoubted contempt of an aggravated character; but when passed through the crucible of our state Constitution, instead of a contempt of court, they become a mere libel

on the functionary, and subject only to the punishment prescribed by law for the latter offense."

Thus holding that the power investigated was a mere usurpation, that the act complained of was not a contempt of court at all but a criminal libel, the court observed further that the Legislature of the state had enacted a statute, then in force, which was definitive of the whole law upon the subject, viz.:

"The courts shall have power to fine and imprison any person who may be guilty of a contempt of court while sitting, either in the presence or hearing of such court; provided, that such fine shall not exceed one hundred dollars, and no person, for such contempt, shall be imprisoned for a longer period than the term of the court in which the contempt shall have been committed."

It is observed, therefore, that the court decided that the act complained of was not a contempt of court at all but a criminal libel; that as a matter of jurisdiction the court was without power to punish for consequential contempt, even if the act had been a consequential contempt, that even if the act complained of was within the scope of the statute and hence a contempt, the sentence imposed exceeded the statute and was void. It is apparent that upon such determination of these questions all doubt was immediately foreclosed as to the relator's right to liberty. The argument which the court elaborated on the subject of the power of the Governor to pardon for criminal contempt, which offense, it said, was not before it, might nevertheless be sound; but the case thus reviewed, if persuasive at all, is such by reason of the arguments advanced. It is not precedent or authority. That is clear.

Regarding that part of the opinion in Ex parte Hickey, which considered the validity of the pardoning power upon a criminal contempt as argument not as authority, the conclusion reached that the pardon was valid rests upon two grounds: First, that the right to pardon for criminal contempt reposed in the king under the English system; and, secondly, that the

offense either was one against the functionary (presiding judge), to whom it was offered considered as a mere individual, or one against the state. It was not the former; therefore, it was the latter. These arguments will be considered later.

Historically, the next case in which the question was discussed as pertinent to the decision was that of State ex rel. Van Orden v. Sauvinet, decided by the Supreme Court of Louisiana in 1872. I quote the facts in the case as summarized in the opinion itself:

"The facts seem to be that in the month of February of the present year suit was brought against Van Orden, the relator, by J. B. Louis to recover from him a cash box and its contents, alleged to contain the amount of thirty-five thousand dollars in money and public securities, which box and alleged contents had been deposited with the relator for safe-keeping. A writ of sequestration was issued to take the box out of the hands of the relator, and upon his refusal to deliver it he was sentenced to be arrested by the sheriff and to be held in custody by him for the period of ten days as for a contempt of court. Application was then made to the Governor of the state for a pardon which was granted."

The case came into the Supreme Court on habeas corpus, the sheriff having refused to release the prisoner until ordered so to do by the court.

Such were the facts. The Supreme Court of Louisiana, in the opinion rendered, made no observation upon the nature of contempt proceedings, and made no distinction between civil and criminal contempt. It upheld the pardon upon the reasoning that the existence of such power on the part of the Governor is deducted from the scheme of checks and balances in our system of government; and upon the authority of Ex parte Hickey, which case it specifically refers to as an authority; and it was the sole authority relied upon. The opinion says:

"But we are not without authority on the question of the power of the Governor to grant pardons in cases of contempt. In Ex parte Hickey, etc."

It then summarizes the doctrine approved by it in

regard to the pardoning power of the Governor in
contempts, quoting from Ex parte Hickey the precise
language set out in full in the opinion of the court in
this case. Consideration of the arguments advanced
upon the check and balance theory is deferred. The
case of Ex parte Hickey as authority it is unnecessary
to appraise further. The majority opinion cites and
relies upon this case as authority; dismissing the
criticism directed against it to the effect that the
facts made the contempt civil and not criminal as
untenable, it observes that the Louisiana case con-
sidered the facts as constituting criminal contempt and
quotes and approves the reasons assigned, at once
indicative of the interpretation and persuasive of the
validity of it, viz., that the punishment for the con-
tempt is in the nature of a penalty in which the
party injured has no interest and which concerns
the state only as the offended party. The observation
of the majority opinion accepting this argument and
conclusion is deserving of careful attention. The con-
tempt in the Louisiana case was not prosecuted in a
separate proceeding, and, as observed by the court,
unless the imprisonment was ''in a case in which
the court had appellate jurisdiction, the proceeding
would have been dismissed.'' Says the court on this
point:

"We regard the order under which the party in this case
was arrested, and is held in custody by the sheriff, as con-
stituting a part of the proceedings in the suit of Lewis v. Van
Orden. The order of sequestration was rendered by the judge
in the exercise of his judicial functions in determining the
issues presented by the parties. The order of imprisonment
consequent upon the realtor's alleged contempt, forms part of
the proceedings in the action pending. It grew out of and
constituted an important part of those proceedings * * * *
We do not view it in the light of a separate, independent,
isolated action or proceeding detached from the main action,
and wholly unconnected with it."

Here then the situation is made plain. The plain-
tiff in the main action had a certain right, and since
it concerned the possession of a box containing $35,000
in money and securities, of no inconsequential value

to him, the right had to do with the possession of the box delivered to the defendant in trust for safekeeping. The defendant refused to return the box, and the plaintiff brought an action in court for the possession of it, and under appropriate proceedings secured a writ of sequestration against the defendant. Notwithstanding the force of the writ, the defendant refused to do as judicially commanded. Hence the court, resorting to the only remedy that was left, and without which the action of the court in the premises would have been impotent and pitiable, coerced the defendant by imprisonment. That the imprisonment was for ten days is utterly irrelevant. The court retained jurisdiction of the main action and could have repeated the term of imprisonment ad infinitum until the purpose of it was accomplished; and the defendant could have purged himself at any time within the term by performance. This was civil contempt. Gompers v. Buck's Stove & R. Co., 221 U. S. 418, 31 Sup. Ct. 492, 55 L. Ed. 796, 34 L. R. A. (N. S.) 874; State ex rel. Rodd v. Verage, 177 Wis. 295, 187 N. W. 830, 23 A. L. R. 491. Otherwise the majority opinion in this case seriously erred as to what constitutes civil contempt. Now it has been held uniformly and consistently by every court that the pardoning power of the king does not and never did extend to civil contempt. The case now considered is the only one extant that has ever announced so startling doctrine as that contained in the statement in the Louisiana case, quoted and adopted by the majority opinion. The facts were incapable of any construction other than that of civil contempt. The penalty imposed for disobedience to the writ of sequestration, was in substantial character a remedy in which the plaintiff had the same property right that he had in the thing itself, the securing of which to him the penalty purposed. And when the Governor of Louisiana pardoned the defendant, he silenced judicial proceedings and effectually transferred the property in litigation from the plaintiff to the defendant. If the doctrine thus announced by the majority

opinion be sound, since chancery courts act only in personam their decrees henceforth may have effect only if the party against whom they are directed is persuaded to obey them. Certainly they cannot command without at least the tacit imprimatur of the chief executive.

"While it is sparingly to be used, yet the power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law. Without it they are mere boards of arbitration, whose judgments and decrees would be only advisory." Gompers v. Buck's Stove & R. Co, 221 U. S. 418, 31 Sup. Ct. 492, 55 L. Ed. 809, 34 L. R. A. (N. S.) 874.

I do not maintain that this opinion is dictum. I am willing to admit that if the pardoning power of the Governor extends to civil contempt, a fortiori it extends to criminal contempt. I am merely calling attention to the egregious absurdity of the opinion of the court in State ex rel. Van Orden v. Sauvinet and how utterly unworthy it is as authority and precedent.

The next case cited is that of Sharp v. State, decided by the Supreme Court of Tennessee in 1899. The misconduct upon which the contempt was based was that of packing a jury. The case came before the Supreme Court on appeal by the sheriff, who in habeas corpus proceedings in the district court was directed to release the contemner for the reason that the Governor had granted him a pardon. The pardon was valid, the Supreme Court held, because coming within the term of the constitutional provision invoked. "He (the Governor) shall have power to grant reprieves and pardons after conviction except in cases of impeachment." The authority of the court for holding that a sentence for contempt is such a conviction as is intended by the language employed in the Constitution is Ex parte Hickey, State v. Sauvinet, and In re Mullee, 7 Blatchf. 23, Fed. Cas. No. 9,911. There are other cases cited, but an examination of them discloses that they are not in point. The

Mississippi and Louisiana cases are in this opinion quoted at considerable length as setting forth the correct statement of the law and as authority. Inasmuch as the Tennessee case follows the first two decisions mentioned, it adds to them as authority only to the force of its approval. If it adds any weight to the argument advanced, it is found in the case in Re Mullee, which it cites. The Mullee Case grew out of a contempt, in violating an injunction order of the federal court for which that court imposed a fine upon the contemner, which the latter was unable to pay and for that reason applied to the court for the remission of the punishment. To the application the court agreed, but expressed the opinion that he was without power to grant it. Of course, an opinion thus expressed lacks the persuasive force of authority, which, in order to properly deserve the appellation, requires that an applicable rule of law be urged on one side and disputed on the other and thus presented to the court for decision. But conceding the case to be authority for the purpose of argument, the reason of the opinion is based on the proposition that the offense is one against the United States and not against the functionary, which, it is seen, is the same argument that guided the conclusion reached in Ex parte Hickey, and this argument is fortified by the citation of the opinion of Mr. Attorney General Gilpin in Re Dixon, in which the advice of the Attorney General, to the effect that the President has the pardoning power in contempt cases, was bottomed upon the fact that such power was acknowledged to be vested in the king. This is the reasoning of the Louisiana case.

I hazard the observation, therefore, that none of the cases dealing with the pardoning power of the Governor upon a criminal contempt, upon which the majority opinion relies, carries such weight as precedent and authority as to justify the conclusion reached. For the purpose of this discussion I am not unwilling to concede that the cases cited to the point by the state are dicta. But I do maintain that in

the absence of authority and precedent it becomes the manifest duty of the court to consider this case as one of first impression, whcih it is, and consequently to recur to basic principles, to analyze them in the light of all that has been said upon the question at issue, whether dicta or not, and reach such conclusion as these principles inevitably lead to.

What is a contempt? The contempt inquired about is one punishable by summary methods, the one involved in this case. Definition by assemblage of apt words nicely expressive of the thing defined in the abstract is of little practical utility. What is valuable is a true conception of the idea, that which comes irresistibly from a knowledge of the thing in the concrete; from a clear understanding of the practical operation of the court as an institution of government to which the contemner, his conduct, and the punishment inflicted are related.

The government of the state of New Mexico, like its great prototype, the government of the United States, is a constitutional government, republican in form, in which complete and ultimate sovereignty, which resides in the people, by grant of power through the great fundamental law, is delegated to three departments of the government, the Executive, the Legislative, and the Judicial. Each is sovereign and possesses all the attributes of sovereignty in its own field of activity, and each is essential to the effective and orderly conduct of government, the ultimate purpose of which is the general welfare of society. The division of sovereignty in this manner was deemed as necessary as tyranny was held infamous. The division has been styled a system of checks and balances, but in active operation the limitation of each department, according as power is committed to it, forbids the assumption of like power by the other two; for were this not so, the absorption of all power by the most energetic and strongest department would destroy the others, and thus frustrate the very purpose of the division. The proper characterization of the distribu-

tion is that of co-ordination, for each department is in-
dependent and supreme in its own field.   The idea of
the system of check and balances properly understood
excludes all interference by one department with the
powers that belong to another.    This is made clear
by article 3 of the state Constitution:

"Distribution of powers.  Section 1.  The powers of the
government of this state are divided into three distinct depart-
ments, the Legislative, Executive and Judicial, and no person
or collection of persons charged with the exercise of powers
properly belonging to one of these departments, shall exercise
any powers properly belonging to either of the others, ex-
cept as in this Constitution otherwise expressly directed or
permitted."

The Supreme and district courts are created by a
grant of power contained in article 6 of the state
Constitution.   An examination of this article, or indeed
of the entire instrument, discloses that nowhere are
the Supreme or district courts clothed expressly with
power to punish for contempt.   How then do they
possess such power?   The question is not a novel one,
and was answered as to the power exercised in this
respect as well as in many others by Chief Justice
Marshall, in McCulloch v. Maryland, 4 Wheat. 422,
4 L. Ed. 602-605:

"Had it been intended to grant this power as one which
should be distinct and independent, to be exercised in any
case whatever, it would have found a place among the enum-
erated powers of the government.  But being considered mere-
ly as a means, to be employed only for the purpose of carry-
ing into execution the given powers, there could be no motive
for particularly mentioning it."

Commenting hereon, the United States Supreme
Court says in Marshall v. Gordon, 243 U. S. 521, 37
Sup. Ct. 448, 61 L. Ed. 885, L. R. A. 1917F, 279 Ann.
Cas. 1918B, 371:

"The rule of constitutional interpretation  announced in
McCulloch v. Maryland, 4 Wheat. 316, 4 L. Ed. 579, that that
which was reasonably appropriate and relevant to the ex-
ercise of a granted power was to be considered as accompany-
ing the grant, has been so universally applied that it suffices
merely to state it.  And as there is nothing in the inherent

nature of the power to deal with contempt which causes it to be an exception to such rule, there can be no reason for refusing to apply it to that subject."

In what respect is power to punish for contempt an implied power; that is, reasonably relevant and appropriate to the exercise of the power expressly granted, namely, the power judicially to administer the law of the land? The answer is best given by a consideration of the decisions of the United States Supreme. Court. Incidentally, the matter first came before that court with reference to the implied power to the federal Legislature, but what was so announced is not inapposite to the point here considered, for recently the same court has reiterated approval and applied all thus said to the judicial power as equally appropriate to it. Toledo Newspaper Co. v. United States (October term, 1917) 247 U. S. 402, 38 Sup. Ct. 560, 62 L. Ed. 1193.

The case of Anderson v. Dunn came before the federal Supreme Court (February term, 1821), 6 Wheat. 204, 5 L. Ed. 242, upon the question whether the United States House of Representatives could imprison, for contempt of its authority, the alleged contemner, who was arrested by the sergeant-at-arms of that body, under a house warrant, having brought a charge against such officer for false imprisonment. To the question thus presented, Mr. Justice Johnson said, upholding the contempt power of the House:

"It is true that such a power if it exists, must be derived from implication, and the genius and spirit of our institutions are hostile to the exercise of implied powers. Had the faculties of man been competent to the framing of a system of government which would have left nothing to implication, it cannot be doubted that the effort would have been made by the framers of the Constitution. But what is the fact? There is not in the whole of that admirable instrument a grant of powers which does not draw after it others, not expressed, but vital to their exercise; not substantive and independent, indeed, but auxiliary and subordinate. * * *

"But if there is one maxim which necessarily rises above all others in the practical application of government, it is, that the public functionaries must be left at liberty to exercise the powers which the people have intrusted to them. The

interests and dignity of those who created them, require the execution of the powers indispensable to the attainment of the ends of their creation. Nor is a casual conflict with the rights of particular individual any reason to be urged against the exercise of such powers.

. "That 'the safety of the people is the supreme law,' not only comports with, but is indispensable to, the exercise of those powers in their public functionaries, without which that safety cannot be guarded. On this principle it is, that courts of justice are universally acknowledged pose silence, respect, and decorum, in their presence, and submission to their lawful mandates, and, as a corollary to this proposition, to preserve themselves and their officers from the approach and insults of pollution."

· In Marshall v. Gordon (October term, 1916) 243 U. S. 521, 37 Sup. Ct. 448, 61 L. Ed. 881, L. R. A. 1917F, 279, Ann. Cas. 1918B, 371, the federal Supreme Court again had under consideration the contempt power of the national ·House of Representatives; and reaffirming what has been said in Anderson v. Dunn, supra, and clarifying the doctrine of that case with reference to later cases decided by it, and with reference to the English case, Kielley v. Carson, it again stated the essential meaning of contempt:

"What does this implied power embrace? Is thus the question. In answering, it must be borne in mind that the power rests simply upon the implication that the right to be vested, by their very creation, with power to im- of some other and substantive authority expressly conferred. The power is therefore but a force implied to bring into existence the conditions to which constitutional limitations apply. It is a means to an end, and not the end itself. Hence it rests solely upon the right of self-preservation to enable the public powers given to be exerted.* * *

"Without undertaking to inclusively mention the subjects embraced in the implied power, we think from the very nature of that power it is clear that it does not embrace punishment for contempt as punishment, since it rests only upon the right of self-preservation; that is, the right to prevent acts which, in and of themselves, inherently obstruct or prevent the discharge of legislative duty or the refusal to do that which there is an inherent legislative power to compel in order that legislative functions may be performed. And the essential nature of the power also makes clear the cogency and application of the two limitations which were expressly pointed out in Anderson v. Dunn, supra; that is, that the power, even when applied to subjects which justify its exercise, is limited to imprisonment,

and such imprisonment may not be extended beyond the session of the body in which the contempt occurred. Not only the adjudged cases, but congressional action in enacting legislation as well as in exerting the implied power, conclusively sustain the views just stated. Take, for instance, the statute referred to in Re Chapman, where, not at all interfering with the implied congressional power to deal with the refusal to give testimony in a matter where there was a right to exact it, the substantive power had been exerted to make such refusal a crime, the two being distinct the one from the other."

Again in Toledo Newspaper Co. v. United States, 247 U. S. 402, 38 Sup. Ct. 560, 62 L. Ed. 1186, which was a review of a sentence of contempt imposed upon the contemner for abusive language toward the federal court, with reference to an injunction suit pending before it, reviewing the Marshall v. Gordon Case, and previous decisions in line with it, the court said:

"While the Marshall Case concerned the exercise of legislative power to deal with contempt, the fundamental principles which its solution involved are here applicable to the extent that they may not be inapposite because of the distinction between legislative and judicial power. Indeed, the identity of the constitutional principles applicable to the two cases, subject to the difference referred to, was pointed out on pages 542 and 543, where it was said: 'So, also, when the difference between the judicial and legislative powers is considered and the divergent elements which, in the nature of things, enter into the determination of what is self-preservation in the two cases, the same result is established by the statutory provision dealing with the judicial authority to summarily punish for contempt; that is, without resorting to the modes of trial required by constitutional limitations or otherwise for substantive offenses under the criminal law. Act of March 2. 1831, 4 Stat. at L. 487, c. 99, Comp. Stat. 1916, § 1245.'
*   *   *

"Clarified by the matters expounded and the ruling made in the Marshall Case there can be no doubt that the provisions [268 of the Judicial Code] conferred no power not already granted and imposed no limitations not already existing. In other words, it served but to plainly mark the boundaries of the existing authority resulting from and controlled by the grants which the Constitution made and the limitations which it imposed. And this is not at all modified by conceding that the provision was intended to prevent the danger by reminiscence of what had gone before or attempts to exercise a power not possessed, which, as pointed out in the Marshall Case, had been sometimes done in the exercise of legislative power. The provision, therefore, conformably to the whole history of the

country, not minimizing the constitutional limitations nor restricting or qualifying the powers granted, by necessary implication recognized and sanctioned the existence of the right of self-preservation; that is, the power to restrain acts tending to obstruct and prevent the untrammeled and unprejudiced exercise of the judicial power given by summarily treating such acts as a contempt and punishing accordingly. The test, therefore, is the character of the act done and its direct tendency to prevent and obstruct the discharge of judicial duty."

And in harmony with what was said supra, in the case of Craig v. Hecht, 44 Sup. Ct. 103, 68 L. Ed. —, decided by the federal Supreme Court, at the present term, Mr. Chief Justice Taft, concurring in the opinion of the court, observed:

"The remedy of the judge as an individual is by action or prosecution for libel. If, however, the publication is intended and calculated to obstruct and embarrass the court in a pending proceeding in the matter of the rendition of an impartial verdict, or in the carrying out of its orders and judgment, the court may, and it is its duty to protect the administration of justice by punishment of the offender for contempt."

Without venturing on the perilous enterprise of framing an adequate definition, it may be said that a summary contempt of court, as is evident from the judicial expressions above set forth, and they are of the highest character, carries these fundamental conceptions: It is conduct intended and calculated to obstruct and embarrass the court in pending proceedings in the matter of the rendition of an impartial verdict (criminal contempt), or in the carrying out of orders and judgment (civil contempt), which justifies the court, or rather makes it the duty of the court, to visit such punishment upon the offender as will protect the administration of justice. Taft, C. J., in Craig v. Hecht, supra. The substance of the proceeding is the exertion by the court of the implied power of self-preservation. The object of the exertion of the power is not punishment as punishment. Toledo Newspaper Co. v. United States, supra. But the punishment is only a means to an end. Id. And the quantum of punishment is limited of necessity, by the end which

it contemplates, "the least possible punishment ade-
quate to the end proposed." Anderson v. Dunn. The
end is, of course, the effective and impartial adminis-
tration of justice.

Conceding that what is above said is a correct anal-
ysis of the essential nature of contempt, it follows that
the entire operation of proceedings in contempt matters
is within the power of self-preservation, implied to
courts by reason of the grant to them of the judicial
function. The power to punish for contempt emanates
from the court, and not from the lawmaking power
created by the Constitution. This is so far the fact
that a conviction in summary contempt proceeding
bears no relation to a conviction for criminal contempt
as defined by the lawmaking power, both convictions
referring to the same act. In re Chapman, 166 U. S.
661, 17 Sup. Ct. 677, 41 L. Ed. 1159; Marshall v. Gor-
don, 243 U. S. 521, 37 Sup. Ct. 448, 61 L. Ed. at page
881, L. R. A. 1917F, 279, Ann. Cas. 1918B, 371. A
court punishing for criminal contempt is vindicating
its own authority and not administering the criminal
law. Re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L.
Ed. 1092; Eilenbecker v. Plymouth County District
Court, 134 U. S. 31, 10 Sup. Ct. 424, 33 L. Ed. 801;
Bessette v. W. B. Cokney Co., 194 U. S. 324, 24 Sup.
Ct. 665, 48 L. Ed. 997. The relation of the power to
the effective and impartial administration of justice is
such as to be essential to it. Re Debs, supra; Gom-
pers v. Buck's Stove Co., 221 U. S. 418, 31 Sup. Ct.
492, 55 L. Ed. 807, 34 L. R. A. (N. S.) 874. And
since the power is essential, the Legislature can no more
deprive courts created by the Constitution of it than
they can deprive them of the power to perform the ju-
dicial function. Hale v. State, 55 Ohio St. 210, 45 N.
E. 199, 36 L. R. A. 254 and note, 60 Am. St. Rep. 691.

That a crime, therefore, as judicially defined, and
a criminal contempt, bear no kinship one to the other,
would seem to be the statement of a truism. The two
conceptions are mutually exclusive, diverso intuitu.
Re Chapman, supra. They are as different as the

lawmaking function is different from the judicial function; as the general welfare of society, with which the criminal laws are concerned, is different from the vindication of the authority of a particular court with reference to a pending case.

It is true the constitutional provision upon the construction of which this case turns employs the term "offense," yet there is not such a distinction between the two expressions as to lend any force whatsoever to the argument based upon the use of the one word rather than the other. "So the words 'offense' and 'crime' are synonymous when applied to convictions of a public nature." 16 C. J. 52. In Campion v. Gillan, 79 Neb. 367, 112 N. W. 586, 11 L. R. A. (N. S.) 865, 126 Am. St. Rep. 673, 16 Ann. Cas. 319, the Supreme Court of Nebraska examined the provisions of the Constitution of that state as to the pardoning power, which is:

"The Governor shall have power to grant reprieves and pardons, after conviction for all offenses except treason and cases of impeachment."

It said:

"The Constitution gives the Governor power to pardon 'offenses,' and it is suggested that bastardy is an offense, although we have no statute defining and punishing it as a crime, and so the Governor may pardon the wrongdoer and relieve him from all consequences of his act. The provision of our Constitution is too plain to lead to such absurd conclusions. The word 'offense' in a public statute is generally, though not always, used as synonymous with 'crime.' In State v. West, 42 Minn. 147, 43 N. W. 845, it is said that the terms 'crime,' 'offense' and 'criminal offense' are all synonymous and are ordinarily used interchangeably. At all events, the words are so used in the section of the Constitution under consideration. There can be no doubt that 'crime' in the latter part of the section is used as an exact equivalent of the word 'offense' in the first part, and that the words 'convict' and 'sentence' are used with reference to both. Unless there has been a crime and conviction the Governor cannot interfere with a pardon."

Indeed, that the nature of an ordinary criminal prosecution is wholly foreign to that of summary proceedings for criminal contempt is universally recog-

nized by all courts. Crimes are punishable only in courts having criminal jurisdiction. Criminal ,contempts, however, are punishable in all courts of record whether or not their jurisdiction be limited to civil, chancery, or appellate matters. This court, for instance, is without original criminal jurisdiction. Yet I doubt if it would so far hold to the proposition that a criminal contempt committed against it was a ''crime'' that the offense would of necessity go unpunished unless by the usual course of indictment and trial by a court of inferior jurisdiction.

Moreover, the designation of a criminal contempt as a crime or offense considered with reference to another constitutional provision leads to serious difficulties, for this reason: It is a familiar rule of statutory construction that statutes, and the same rule applies to constitutional provisions, in pari materia should be construed together, because, the cardinal purpose of construction being the ascertainment of legislative intent, it is presumed that provisions relating to the same subject-matter are consistent and harmonious, so that an expression conveying a fixed meaning in one provision carries the identical meaning in another provision in pari materia. Section 14, art. 2, of our Constitution, provides:

"In all criminal prosecutions the accused shall have the right," etc., of a "public trial by an impartial jury of the county or district in which the offense is alleged to have been committed."

Now it is clear that this provision is in pari materia with the constitutional provision, supra, relating to the pardoning power. The expression cannot carry radically different meanings in the two provisions; it cannot be Dr. Jekyll to support a pardon and Mr. Hyde to deny a trial by jury.

The decisions uniformly disavow the applicability of such constitutional provisions to a criminal contempt. The reason is obvious; on the one hand, the power of self-preservation ex vi termini implies the

exclusive right to the court to try the offender and to judge as to the punishment adequate to the vindication of its own authority (Gompers v. Buck's Stove Co., supra), and, on the other hand, defines the conduct of the contemner as not coming at all within the meaning of such constitutional guaranties (Re Debs, supra).

The overwhelming weight of authority is to the effect that a criminal contempt of court is not a crime, and a proceeding thereon, not a criminal proceeding, and that positively considered, because the proceeding is only the exertion by the court of the power of self-preservation, it is sui generis. I refer the bar to the very able opinion of the Supreme Court of Arizona decided December 30, 1922, Van Dyke v. Superior Court, 24 Ariz. 508, 211 Pac. 576, in which case there is a careful and exhaustive analysis of about all the authorities in regard to the nature of a criminal contempt. The case concludes:

"It is no less certain that it is not a criminal action which is to be prosecuted by indictment or information as provided by our Constitution and Penal Code (Const. art. 2; Penal Code, § 750). It is perhaps not unwarranted to say that virtually all the authorities which announce any express holding as to the nature of a proceeding to punish for criminal contempt go upon the assumption that such a proceeding is sui generis, being the exercise of the inherent power of courts to free themselves from influences calculated or tending to obstruct, embarrass, or corrupt the administration of justice. From these general principles, in their bearing upon the specific cases of applications to secure changes of venue, or to disqualify the presiding judge, the rule is deduced that, unless the statute contain language broad enough in meaning to include a proceeding instituted to punish for contempt, the change of judge or venue cannot be made, and that the language 'criminal action' or 'civil action' is not to be interpreted as embracing a contempt proceeding." Bessette v. W. B. Conkey Co., supra.

Here it might be worthy to note that the language employed by some of the decisions of the federal Supreme Court as to the nature of criminal contempts has been misinterpreted to mean that that court considered proceedings in regard to them as criminal pro-

ceedings. A careful reading of the cases forbids such
a conclusion. That court has always characterized
contempt proceedings as sui generis, and, for the pur-
pose of review only, has considered them as governed
by the rules applicable to criminal matters. This is
the interpretation which the court itself has expressed
as to these cases. In Toledo Newspapar Co. v. United
States, supra, to this point the court says:

"We are of opinion that a motion to dismiss the writ
of error must prevail, since it is settled that a conviction for
a criminal although summary contempt is, for the purposes
of our reviewing power, a matter of criminal law not within
our jurisdiction on error"—citing numerous cases, among
them, as being within the interpretation thus announced,
Gompers v. United States, 233 U. S. 604, 34 Sup. Ct. 693,
58 L. Ed. 1115, Ann. Cas. 1915D, 1044, which case the
majority opinion refers to as decisive of the proposition
that a criminal contempt is a crime or offense within the
meaning of the constitutional provision defining the par-
doning power.

The view which this court thus takes of the case is
not in harmony with that of the federal Supreme Court
itself.

I recur now to Ex parte Hickey, to assess the sound-
ness of the argument therein elaborated to the conclu-
sion that a criminal contempt was within the pardon-
ing power of the Governor, notwithstanding that it had
been found by the court that there was no contempt in-
volved in the case.

The provision of the Constitution of Mississippi
(Const. 1832, art. 5, § 10), examined by that court was,
the Governor shall, etc., "have power to grant re-
prieves and pardons, and to remit fines in all crim-
inal and penal cases, except treason and impeach-
ment"; the language employed, in form, being more
restrictive than the language employed in our Con-
stitution, though not so in substance. At the threshold
the court tacitly admitted that in order to sustain the
pardon, it was essential to bring a contempt of court
as an offense within the classification of a "criminal
charge" or "criminal case," which expression it held

to be within the purview of Blackstone's definition, namely:

"A crime or misdemeanor is an act committed or omitted in violation of a public law either forbidding or commanding it."

The court proceeded, and very correctly, upon the premise that the acts pardonable, under the Constitution, were public offenses, which are generally defined as "the doing that which a penal law forbids to be done or omitting to do what it commands." 32 Cyc. 1249. That is to say, a contempt of court to be pardonable must be a crime or a public offense. The minor premise is attempted to be established evidently by drawing a distinction between public offenses and civil wrongs, which latter are wrongs to the individual in which the public have no interest. A contempt of court it was argued, because it is not an offense against the functionary as an individual, was consequently a public offense and a crime. The fallacy of the argument lies in the manner of establishing the minor premise. To affirm logically that X is A because it is not B requires, first, satisfactory proof that of necessity X must be found within the alternatives. A contempt of court, as has been shown, is in essential character neither a criminal case nor a civil case, but sui generis, that is, an offense against the court; so that the possibility of X being C instead of A or B being proven, the whole argument collapses.

It is to be noticed, also, that the court had just announced the doctrine that an offense to the person of the functionary was a criminal libel and not a contempt. We come, therefore, by transposing terms, to the weird proposition that a contempt of court is an offense against the state and a crime because it is not a criminal libel which is crime. The argument, I think, need not be criticized further.

It was maintained in Ex parte Hickey that the constitutional provision in regard to the freedom of the press, quoted supra, together with the other provisions already mentioned, operated to metamorphose to a

criminal libel, what, judged by the practice and as-
sumption of some of the courts, English and American,
would have been a criminal contempt and as to publi-
cations at least to restrain the power of the court to
punish as for the latter offense.     To this doctrine the
final answer, I believe, was given by Mr. Chief Justice
White in Toledo Newspaper Co. v. United States:

> "We might well pass the proposition by because to state
> it is to answer it, since it involves in its very statement
> the contention that the freedom of the press is the freedom
> to do wrong with impunity, and implies the right to frus-
> trate and defeat the discharge of those governmental du-
> ties upon the performance of which the freedom of all,
> including that of the press, depends.     The safeguarding
> and fructification of free and constitutional institutions is
> the very basis and mainstay upon which the freedom of
> the press rests, and that freedom, therefore, does not and
> cannot be held to include the right virtually to destroy such
> institutions.     It suffices to say that, however complete is
> the right of the press to state public things and discuss
> them, that right, as every other right enjoyed in human
> society, is subject to the restraints which separate right
> from wrongdoing."

There remains then to be considered the proposition
which, it has been seen, constitutes the principal argu-
ment, by implication at least, in the case followed by
the majority of the court to the effect that the Gover-
nor possesses the power to pardon for criminal contempt
because like power was in fact possessed and exer-
cised by the king under the English system.    It is un-
necessary to observe that by statutory recognition the
common law of England is here the rule of practice
and decision except as modified by express statute.
Upon this rule there is imposed the limitation that only
so much of that system is adopted as is compatible with
our peculiar  conditions and with the genius of our
government and institutions.    That the application of
the limitation to the question considered excludes the
power of the Governor to pardon for criminal contempt
upon the ground of analogy to the power of the king
becomes immediately apparent.    Under our system, as
stated above, all power emanates from the people.
Under the English system, all power emanates from
the king, who is in theory "the source and fountain of

justice.'' The executive here has such power only as the Constitution confers upon him, but the king could pardon for criminal contempt because in him was reposed originally all judiciary power. He could review judicial action because the courts were his courts and perform the judicial functions because such power was by him delegated to them. Says Blackstone in this regard:

"The sole executive power of the laws is vested in the person of the king; it will follow that all courts of justice, which are the medium by which he administers the laws, are derived from the power of the crown. For whether created by act of Parliament or letters patent, or subsisting by prescription (the only methods by which any court of judicature can exist), the king's consent in the two former is expressly, in the latter impliedly, given. In all these courts the king is supposed in contemplation of law to be always present; but as that is in fact impossible, he is then represented by his judges, whose power is only an emanation of the royal prerogative."

The power of the Governor and the power of the king under the English system to the extent that they affect the power to pardon for criminal contempt are irreconcilable. See State ex rel. Rodd v. Verage, 177 Wis. 295, 187 N. W. 830, 23 A. L. R. 508; Re Nevitt, 117 Fed. 448, 54 C. C. A. 622; Taylor v. Goodrich, 25 Tex. Civ. App. 109, 40 S. W. 515.

Therefore, I say, the cases followed by the court not only lack persuasiveness as authority, in that they are cast to the mold of Ex parte Hickey, but the doctrine announced by them as supporting the conclusion reached that the Governor may pardon for criminal contempt is clearly fallacious.

''A pardon is an act of grace, proceeding from the power intrusted with the execcuion of the laws, which exempts the individual on whom it is bestowed from the punishment the law inflicts for a crime he has committed.'' This is the language of Chief Justice Marshall in United States v. Wilson, 7 Pet. 150, 8 L. Ed. 640, and is the classical definition of a ''pardon.'' It is seen that the very essence of the pardoning power lies in this: That because the Governor (as here) is

State v. Magee Pub. Co. et al. 29 N. M. 455

charged with the execution of the laws he may pardon by an act of grace for an infraction of such laws. The laws, with the execution of which the executive is charged, are penal laws of statutory recognition because they are public offenses, and it is consequently public offenses that the framers of the Constitution had in mind in defining the pardoning power. State ex rel. Rodd v. Verage, 177 Wis. 295, 187 N. W. 830, 23 A. L. R. 509:

"As the Governor is charged with the duty of seeing that the laws be faithfully executed, it is in strict accordance with the theory of the power of pardon that he should have power to pardon offenders against the laws which it is his duty to execute. But should such power extend to offenses with respect to which he has no duty or concern? Does the power of one to pardon the violation of a law which it is not his duty to execute comport with the theory of the pardoning power? If the Governor is not charged with the duty of enforcing obedience to the orders of the court, on what theory should he have the power to forgive disobedience of those orders? The power of the sovereign to pardon is much like the power of an individual to remit a debt. A. may remit a debt owing to him by C., but B. is without power to remit the debt which C. owes to A."

Here the fact is to be attended to that when we speak of an offense against the state, what is meant is a public offense, one of legislative recognition; that is, either defined by express statute or known to common law and adopted by legislative act. Clarified by this statement, a discussion of the offense here considered as against organized society or as against the majesty of the law is a matter of vocabulary and rhetoric, not of actuality and substance; for, if organized society denounces an act as criminal, it does so through constitutional methods, that is, by legislative act. Obviously, the majesty of the law is a pure abstraction and can neither declare an act criminal nor impose a penalty for its violation. It is true that the court is that institution of the government which bespeaks the majesty of the law and which is the very cornerstone of organized society; consequently, a criminal contempt of court, in that it outrages the dignity and authority

of the court, is, in this respect, essentially an offense against the majesty of the law, against organized society, against the state; but in the sense of being an offense against the public law with the execution of which the Governor is charged, it emphatically is not an offense against the state.

Indeed, the statement of the constitutional provision itself lends no little force to the proposition that by the application to it of the ordinary rule of interpretation the "offenses" which the Governor may pardon are such offenses as are of usual statutory recognition. The classification of crimes at common law was treason, felonies, and misdemeanors. 16 C. J. 55. The inference is legitimate that, when "treason" was excepted from the offenses pardonable, the word "offense" was intended to mean the classification in which treason would have been included save for the exception.

So far as the judicial function is concerned, there is no relation whatsoever between the pardon of an ordinary crime as denounced by legislative act and the pardon of a criminal contempt. The pardon of a criminal after conviction, when he is beyond the jurisdiction of the court, has no more to do with the impartial and unembarrassed administration of justice with reference to a pending case, with the court as an institution of government, than has the failure of the sheriff to arrest one suspected of a crime, before he has been brought within the jurisdiction of the court. The acts of executive officers in both instances concern the welfare of society, and are meaningless so far as they might affect the court as an institution of government. On the other hand, the contempt power is an essential part of the judicial function without which justice cannot be impartially and effectively administered. To this effect the United States Supreme Court says, in Re Debs, quoting with approval the Supreme Court of Mississippi in Watson v. Williams, 36 Miss. 331:

"The power to fine and imprison for contempt, from the earliest history of jurisprudence, has been regarded as a

necessary incident and attribute of a court, without which it could no more exist than without a judge. It is a power inherent in all courts of record, and coexisting with them by the wise provisions of the common law. A court without the power effectually to protect itself against the assaults of the lawless, or to enforce its orders, judgments, or decrees against the recusant parties before it, would be a disgrace to the legislation, and a stigma upon the age which invented it." 39 L. Ed. 1106.

If the contempt power is so defined with reference to the administration of justice and if the punishment inflicted is a means to an end, it would seem to be incontrovertible that to exempt an individual from such punishment destroys the means to the end and frustrates the accomplishment of that end, so that the Governor consequently can no more annul the punishment than he can destroy the court itself. If the exercise of the contempt power is, as above stated, the exertion by the court of the implied power of self-preservation, that it cannot be interfered with by another department of government is an a priori judgment; if the definition of the power in its essential character be correct, the denial of the pardoning power with reference to it becomes a matter of logical necessity. The same implication from which the power is derived serves to exclude the pretensions of the Governor to pardon. This is made clear by the great Justice Story, the associate and compeer of Marshall himself, in Story on the Constitution (5th Ed.) §1503:

"It would seem to result from the principle on which the power of each branch of the Legislature to punish for contempts is founded that the executive authority cannot interpose between them and the offender. The main object is to secure a purity, independence, and ability of the Legislature adequate to the discharge of all of their duties. If they can be overawed by force, or corrupted by largesses, or interrupted in their proceedings by violence, without the means of self-protection, it is obvious that they will soon be found incapable of legislating with wisdom or independence. If the executive should possess the power of pardoning any such offender, they would be wholly dependent upon his good will and pleasure for the exercise of their own powers. Thus, in effect, the rights of the people intrusted to them would be placed in perpetual jeopardy. The Constitution is silent in respect to the right of granting pardons in such cases, as it is in respect to the jurisdiction to punish for contempts. The

latter arises by implication; and, to make it effectual, the former is excluded by implication."

What the great justice said above is forcibly expressed with more particularity by Judge Sanborn, of the United States Circuit Court of Appeals, in Re Nevitt, 117 Fed. 456, 54 C. C. A. 630:

"If the President has the power to pardon those who are committed for criminal contempts of the authority of the courts, and thus to relieve them from fines or imprisonments inflicted to punish them for their disobedience, this immemorial attribute of judicial power is thus practically withdrawn from the courts and transferred to the executive; for he may pardon whom he will, and he would have the power to so exercise this authority as to deprive the courts of all means to punish for disobedience of their orders. Is there any provision of the Constitution of the United States which grants this inherent and essential attribute of judicial power, or the authority to control its exercise, to the executive? Congress has undoubted authority to punish recalcitrant witnesses for contempt of its authority. The offenses of such witnesses are as much offenses against the United States as the offenses of witnesses jurors, or parties who disobey the orders, writs, or processes of the courts. May the President pardon such witnesses who are committed for the purpose of punishing them for the disobedience of such orders and processes, and thus deprive Congress and the courts of the ability to punish for disobedience of their lawful orders and processes? If a court fines or imprisons a juror because he refuses to obey its mandate when summoned, or because he refuses to act when he appears, may the President immediately pardon him, and thus relieve him from all punishment for disobedience of the order of the court? May he pardon all jurors for all disobedience of the mandates of the courts, and thus practically deprive the courts of the power to summon jurors? If riotous persons are fined or imprisoned for disturbing, defying, and preventing the proceedings of a court, may the President pardon them, and thus deprive the court of the power to continue its sessions and to discharge its functions? In other words, has the executive the power, if he chooses to exercise it, of drawing to himsefl all the real judicial power of the nation which the Constitution vested in express terms in the courts, by means of his supreme control of the inherent and essential attribute of that power—the authority to punish for disobedience of the orders of the courts? These questions seem to suggest their answers."

To the same effect the doctrine is elaborated by the

Court of Civil Appeals of Texas in Taylor v. Goodrich, 25 Tex. Civ. App. 124, 40 S. W. 523:

"The real inquiry is whether a contempt proceeding is a criminal case, within the meaning of this constitutional provision. If the words 'criminal case' are confined to the crimes mentioned in the Penal Code, and should be held to be construed only as the terms 'crime,' and 'offense' are therein defined, there would be little difficulty in reaching a correct conclusion upon this question; for the question of contempt is not mentioned in the Penal Code, and is not there characterized as a crime or offense. When we inquire into the reason of the law that confers the power upon the courts to punish for contempts, we cannot well perceive that the Constitution, in authorizing the executive to pardon crimes, and remit fines in criminal cases, intended that the power should be exercised in contempt cases, and that such cases should be regarded as criminal. The efficiency and integrity of courts demand that they shall have the right, in order to transact their business in an orderly way, to require the observance of decorum, and to punish those who may interfere with them when exercising their judicial functions, or who may at such times, by willful conduct, interfere with the peace of the court, or bring it into contempt. If the power is given to the Governor to pardon in cases of this character, it admits the weakness and want of the power in the court to preserve its standing and to protect itself from contempt, and would virtually lodge in the Governor the final power to determine if a contempt has been shown to the court, and whether the party should be punished. Such a concession of authority is incompatible with many provisions of law on the subject of contempt. How could a court preserve the ends of justice by compelling an unwilling witness to testify, if the Governor could relieve him from the punishment inflicted by the court for his refusal? How may a court enforce its orders in injunction and mandamus, and in other proceedings, if a Governor may virtually set them aside by pardoning the one who has wilfully disobeyed them. How may obedience to the process of the court be enforced, if a Governor may stand between the court and the one that has disobeyed it. How may a court, in an orderly and efficient way, perform its official functions and public duties, if a Governor may paralyze its power in furtherance of these ends? The moment you admit that a Governor has the power to cripple a court in the performance of its duties, in the way noticed, then it virtually follows, as a sequence, that the courts, in the administration of justice, are under the control of the Governor, and while he cannot influence their judicial acts and conduct, he may control them. It is not believed that the Constitution of this state intended to invest him with any such power."

In re Nevitt is valuable only for the argument that

it contains; for that part of the case which had to do with the right of the President to pardon is, as the court stated, dicta.    The statement of the court, however, in the case of Taylor v. Goodrich, with reference to the pardoning power, is authority and precedent. The criticism made against it in this respect, to the effect that it is not in point because of the fact that in Texas there are no crimes except those defined by statutes, is, I think, made unavailing by a cursory examination of the case and the reasons given by the court that lead to the conclusion reached.    The court itself said that its decision depended upon the interpretation of the constitutional provision defining the pardoning power.    Very clearly such interpretation is a judicial and not a legislative matter, so that the court was not concluded by the legislative act in excluding a criminal contempt from the definition of crimes.    It is clear that what the court did was to give weight to the legislative interpretation that a criminal contempt is not a substantive crime; but, even had the Legislature defined, a "criminal contempt" as a substantive crime, certainly it could not be held that its act in so doing was bniding on the court.    It might be observed further to this point, that if the contention that a summary contempt is a substantive crime be true in fact, and under the laws of Texas there are no crimes except those of legislative definition, then it would result that the courts of Texas are without power to punish criminal contempt—a conclusion which, I apprehend, might come as a considerable surprise to the judiciary of Texas.    The criticism proves too much.

The duties of the Governor are executive, except as the approval or veto of a legislative act is the exercise of legislative function.    Nowhere in the Constitution is power conferred upon the Governor to review or interfere with judicial proceedings.    That power is conferred upon the Supreme Court.    It alone has appellate jurisdiction as to the orders, decrees, and judgments of and a superintending control over

State v. Magee Pub. Co. et al. 29 N. M. 455

inferior courts. Article 6, State Constitution. The grant of judicial power in one case is no clearer or more emphatic than is the exclusion of it in the other. That the granting of a pardon for a criminal contempt is the exercise of a superintending control over the court in which such proceedings were had is too plain to require argument. The Governor of an American state is not only the repository of those powers consti-tutionally conferred upon him, but he is the titular head and actual leader of the particular party which put him in office, and as such he is not insensitive to political draughts—a consideration which most strongly denies any intent or purpose on the part of those who designed our fundamental law to press upon the judicial process the dead hand of political expedi-ency. On the contrary, a vigorous independent judi-ciary is the very bulwark of our institutions. The Constitution reflects such a conception of the judiciary. That the typical state executive may be depended upon not to exercise the power here asserted except in rare instances, though such power be conceded to him. and that the fears for the judiciary here expressed are fan-ciful rather than real, is an irrelevant consideration. Finem volunt media. The question concerns the con-stitutional existence of power; that granted, it may be exercised in any of the instances above stated and to the frustration of judicial power as indicated. Only, if the extension of the pardon power to criminal con-tempt be clearly indicated by the language of the Con-stitution should the pardon in this case be upheld; not by forcibly reading that intent into the provision ex-amined.

For these reasons I dissent.